**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

ANTONIO COPELAND,

           Defendant.

Case No. 24-cr-11-CJW

**REPORT AND RECOMMENDATION
ON DEFENDANT'S MOTION TO
SUPPRESS**

_____

**TABLE OF CONTENTS**

                                                           **Page**

*I.*     *INTRODUCTION*.................................................................3

*II.*    *FINDINGS OF FACT*.........................................................5

      *A.*    *The Open-Air Dog Sniff*..........................................**5**

      *B.*    *Training and Performance of Officer Hagarty and Ryder* ...............**11**

      *C.*    *Sergeant Trimble's Testimony*...................................**12**

      *D.*    *Jerry Potter's Testimony* .......................................**12**

*III.*   *DISCUSSION*.................................................................**15**

      *A.*    *Parties' Arguments* .............................................**15**

            *1.*    *Defendant's arguments*...................................**15**

            *2.*    *Government's arguments* ................................**19**

      *B.*    *Analysis*........................................................**21**

Case 1:24-cr-00011-CJW-MAR   Document 40   Filed 07/08/24   Page 1 of 60

1. *Franks issues* ................................................................**21**

    a. *Relevant law* ....................................................**21**

    b. *Application* ......................................................**23**

2. *Reliability of the sniff* ..............................................**26**

    a. **Harris** *probable-cause determination* ........................**26**

    b. *Relevant law* ....................................................**29**

    c. *Application* ......................................................**30**

3. *Was there sufficient nexus to support probable cause for the search warrant?* ..........................................**33**

    a. *Relevant law* ....................................................**33**

    b. *Application* ......................................................**34**

4. *Was the dog sniff illegal and did Defendant have a reasonable expectation of privacy?* .........................**37**

    a. *Waiver* ............................................................**37**

    b. *Relevant law* ....................................................**40**

    c. *Application* ......................................................**51**

5. *Is the good faith exception applicable?* ...............**58**

    a. *Relevant law* ....................................................**58**

    b. *Application* ......................................................**59**

*IV.* *CONCLUSION* ...........................................................**60**

2

# I. INTRODUCTION

On February 7, 2024, the Grand Jury returned an Indictment, charging Defendant with one count of Distribution of a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(A), two counts of Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), and 841(b)(1)(C), and one count of Possession of a Firearm by a Felon in violation of 18 U.S.C. Sections 922(g)(1) and 924(a)(8). (Doc. 3.) The matter before me is Defendant's motion to suppress. (Doc. 24.) The motion was filed April 15, 2024, and contained an inventory of items to be suppressed.[1] (*Id.*) The Government timely filed a response on April 22, 2024. (Doc. 27.) Defendant filed a reply on August 26, 2024. (Doc. 30.) The Honorable C.J. Williams, Chief United States District Court Judge, referred the motion to me for a Report and Recommendation. I held a hearing on Defendant's motion to suppress on April 29, 2024. (Doc. 33.) On May 6, 2024, with leave of the Court, the Government filed a post-hearing Supplemental Resistance to Defendant's Motion to Suppress Evidence. (Doc. 36.)

The motion arises from an open-air sniff by drug dog Ryder in the common areas of a locked, multiunit apartment building. Following the dog sniff, law enforcement obtained a search warrant for Defendant's apartment and recovered two firearms, various illegal drugs, and drug packaging materials.

Defendant moves to suppress any evidence obtained from the allegedly unlawful search of his apartment on September 11, 2023. (Doc. 24.) Evidence he seeks to suppress includes: two firearms seized from his apartment, drugs, including

---

[1] In the motion, Defendant states that the inventory of items to be suppressed are "[a]ll items contained in Exhibit C." (Doc. 24 at 1.) Exhibit C is the "Evidence Log" from the search of Defendant's apartment on September 11, 2023. (Doc. 24-4.)

methamphetamine and various pills, evidence of drug residue in a variety of containers, and various drug packaging materials. (*Id.*; *see also* Exhibit C (Doc. 24-4).)

At the hearing, the Government's following Exhibits were admitted without objection:

1. Officer Hagarty's Body Camera Video

2. K9 Certifications regarding K9 training

3. K9 Training Documents

4. Search Warrant dated September 11, 2023

5. Docket from Western District of Texas; United States v. Aaron Jesus Delarosa

6. Jerry T. Potter's Curriculum Vitae filed in Case No. 23-cr-57

8. PACER search

The following Defendant's Exhibits were also admitted without objection:

A. Officer Hagarty's Body Camera Video;

B. Search Warrant dated September 11, 2023

C. CRPD Evidence Log dated September 11, 2023

D. Jerry T. Potter's Curriculum Vitae

E. Hagarty / Ryder Training 2023

F. Officer Hagerty Body Cam Video

G. Cedar Rapids Police Department K9 United Standard Operating Procedures

The Government called Cedar Rapids Police Officer Shawn Hagarty; Cedar Rapids Police Sergeant Nathan Trimble; and Cedar Rapids Police Investigator Mitch Magill. Officer Hagarty has been employed by the Cedar Rapids Police Department ("CRPD") since 2018. He is currently assigned to the Canine Unit. Officer Hagarty and his canine, Ryder, completed a month-long training course from a North Carolina kennel where Ryder was acquired by the CRPD. Their ongoing training is described in more detail below. Sergeant Trimble has been employed by the CRPD since 2011 and

is currently assigned to the Canine Unit as the Canine Supervisor. Sergeant Trimble has been a canine handler since 2015. Investigator Magill has been employed by the CRPD since 2008 and is currently assigned to the Narcotics Unit. Investigator Magill was also assigned to the Canine Unit and was a canine handler for approximately two years. Additionally, outside his work at the CRPD, Investigator Magill was a volunteer FEMA canine handler for approximately five to six years. Defendant called his retained expert regarding dog handling and training, Jerry Potter. I found all witnesses credible even if I find certain facts that are not wholly consistent with their testimony. For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II.    FINDINGS OF FACT

### A.    The Open-Air Dog Sniff

In 2023, Defendant was under investigation by the CRPD. On August 30, 2023, law enforcement, using a confidential informant ("CI"), conducted a controlled drug purchase where the CI bought over 50 grams of methamphetamine from Defendant. (Magill Hr'g Test. at 111.) Using the same CI, law enforcement arranged a second controlled drug purchase on September 11, 2023. Prior to the arranged meeting for the second controlled drug purchase, CRPD officers made contact with Defendant based on Defendant's active arrest warrants. Defendant was arrested, placed in handcuffs, and searched. Officers recovered methamphetamine and cocaine from Defendant's person. (*Id*. at 111-12.) Officer Hagarty arrived on the scene while Defendant was being searched and was handed the drugs recovered from Defendant's person.[2]  (*Id*. at 27; Def. Ex. F at 11:29:05-11:29:13; 00:52-1:00.) Officer Hagarty placed the narcotics in a plastic bag,

---

[2] Before taking the drugs, Officer Hagarty put on a leather glove on his right hand. (Def. Ex. F at 11:29:08-11:29:13; 00:55-1:00.) This drug handling forms a basis the criticism of Defendant's expert.

sealed the bag, and then placed the bag in his patrol vehicle on the front passenger seat.[3] (*Id.*; Def. Ex. F at 11:29:54-11:30:28; 1:41-2:15.)

During the course of the investigation, law enforcement learned where Defendant resided. Specifically, officers knew Defendant's address and apartment number from his driver's license. (*Id.* at 112-13.) At some point, on September 11, 2023, Investigator Magill brought Officer Hagarty into the investigation. Investigator Magill identified the apartment building where Defendant resided for Officer Hagarty but did not provide Officer Hagarty with any information on the exact unit or apartment number where Defendant resided. (*Id.* at 113.) Following Defendant's arrest on the outstanding warrants and recovery of drugs on his person, Investigator Magill directed Officer Hagarty to go to the apartment building and perform a free-air dog sniff. (*Id.* at 119.)

When Officer Hagarty arrived at the apartment building, he found that the entrance was locked. Officer Hagarty returned to his police vehicle and encountered an individual leaving the apartment building who let Officer Hagarty in. (*Id.* at 27-28.) Specifically, this person gave Officer Hagarty the code to enter the building. (*Id.* at 74.) Officer Hagarty testified that he believed this person also lived in the building. (*Id.* at 77.) Inside the apartment building, Officer Hagarty deployed Ryder for a free-air sniff. (*Id.* at 28.)

In describing the interior of the apartment building, Officer Hagarty noted that each floor was "really small" and "confined" to work in. (*Id.* at 29.) Officer Hagarty testified that such spaces are not ideal because Ryder works fast and was liable to bypass a door due to the small work area. Officer Hagarty also noted that, when in small spaces, Ryder sometimes has difficulty coming to a full sit because he may hit up against something in the hallway, such as a wall. (*Id.* at 29-30.)

_____

[3] Before placing the drugs in the plastic bag, Officer Hagarty put a leather glove on his left hand. (Def. Ex. F at 11:29:35-11:29:52; 1:22-1:39.)

6

Ultimately, Ryder indicated on apartment 2. Ryder did not indicate on any other apartments in the building. As a result of Ryder's indication on apartment 2, Officer Hagarty obtained a search warrant. (*Id.* at 30.) Officer Hagarty's affidavit attached to the search warrant stated:

> On 9/11/23, . . your affiant conducted a K9 walk-through at [the apartment building] to assist with an ongoing narcotics investigation by the CRPD Narcotics Unit. Upon entering the building through the east doors Ryder was prompted to sniff the base of each apartment door. As he worked to apartment 2, Ryder demonstrated a distinct change in is behavior. He took in several deliberate breaths and sat down facing apartment 2, after pressing his nose against the bottom and side of the door seam. This is an indication that Ryder detected the odor of narcotics emanating from inside of apartment 2. Ryder was awarded, and eventually placed back into my patrol vehicle.

(Def. Ex. B.) Officer Hagarty testified that he did not include information regarding Defendant's arrest on September 11, 2023, prior to his arrival at the apartment complex or the August 30, 2023 controlled drug purchase because the Narcotics Unit had more information about the arrest and controlled drug purchase than he did and he was focused on his work as a canine handler. (Hagarty Hr'g Test. at 32.) The affidavit also stated that:

> The affiant is a sworn Cedar Rapids Police Officer currently assigned to the K9 unit. . . . Your affiant is currently partnered with K-9 Ryder. Ryder is a 3 year old, male, Belgian Malinois, certified as a dual purpose narcotics detection dog through The National Tactical Police Dog Association. Ryder is trained to detect the odor of the following controlled substances: Marijuana, Cocaine, Methamphetamine, and Heroin. When Ryder locates the odor of one of the aforementioned controlled substances, he is trained to lay down or sit while facing the strongest source of the odor. Your affiant is requesting a search warrant based on the K9 indication of apartment 2.

(Def. Ex. B.)

7

The free-air dog sniff of the apartment building was recorded on Officer Hagarty's body camera and will be discussed in detail.

Upon entering the apartment building, Officer Hagarty and Ryder went to the lower level of the building and Officer Hagarty directed Ryder to sniff the seams of the doors to two downstairs apartments, which were opposite each other on a small landing.[4] Officer Hagarty testified that Ryder did not indicate on either door. (*Id*. at 36-38; Def. Ex. A at 12:15:31-12:15:48, 00:36-00:53.)

Next, Officer Hagarty and Ryder proceeded up the stairs to the middle level of the apartment building where Ryder sniffed at the door seams of the two apartment doors on that level. (Def. Ex. A at 12:15:49-12:16:07, 00:54-1:12.) Officer Hagarty described Ryder's actions on the middle level of the apartment building as follows: (1) Ryder bypassed the door on the right; (2) he circled and bypassed the door on the right again; (3) he sniffed the door across from the door the right, the left door; (4) he passed by the door on the right again; (5) Ryder was directed to sniff the door on the right; (6) he sniffed the bottom left door seam, worked across the door, and snapped his head back toward the left door seam; and (7) he started to sit, but did not fully sit.[5] (Hagarty Hr'g Test. at 38.) Based on the foregoing, Officer Hagarty testified that Ryder had indicated the presence of narcotics on the apartment door on the right, apartment 2. (*Id*. at 38-39.)

---

[4] They encountered the same configuration on each of the three levels of the apartment building. Each level had two apartments across from each other with a small hallway/landing between them. In the middle of the hallway/landing on each level there was a door to a utility closet.

[5] On cross-examination, Officer Hagarty stated that Ryder did not fully sit because the hallway/landing between the two apartment doors was small, and the wall running along the hallway/landing prevented Ryder from making a full sit. (Hagarty Hr'g Test. at 66-67.) Additionally, Officer Hagarty testified that in small spaces like the hallway/landing in this particular apartment building, Ryder sometimes thinks he is in a full sit even though he is not because he is up against a wall. Officer Hagarty also testified that a similar situation could occur outside if Ryder was against a street curb. (*Id*. at 78-79.)

8

After sniffing the two doors on the middle level of the apartment building, Ryder attempted to go to the upper level of the building, but Officer Hagarty brought Ryder back to the middle level. (Def. Ex. A at 12:16:07-12:16:10, 1:12-1:15.) Officer Hagarty explained that when Ryder attempted to sit, Ryder looked at Officer Hagarty expecting to get rewarded with a ball for detecting the odor of narcotics, but Officer Hagarty did not have the ball and Ryder got confused and tried to work up the stairs. (Hagarty Hr'g Test. at 39.) Officer Hagarty brought Ryder back to the middle level of the building, and Ryder sniffed both middle level door seams again. Before sniffing the right door (apartment 2), Ryder snapped his head toward the handle of the right door, and, after sniffing the right door, made a whining noise before, again, wanting to go up the stairs to the upper level of the apartment building. (Def. Ex. A at 12:16:10-12:16:19, 1:15-1:24.) According to Officer Hagarty, Ryder whined because he was not rewarded for detecting narcotics at apartment 2. (Hagarty's Hr'g Test. at 40.)

Officer Hagarty and Ryder proceeded to the upper level of the building where Ryder sniffed at the seams of both doors on the upper level. (Def. Ex. A at 12:16:20-12:16:37, 1:25-1:43.) After Ryder sniffed at both doors, Officer Hagarty stopped at the top of the steps to write in a notebook that Ryder had a change of behavior at apartment 2. (*Id.* at 12:16:38-12:16:58, 1:44-2:04; Hagarty Hr'g Test. at 41.) After making his notes, Officer Hagarty had Ryder sniff at the door seams of both doors on the upper level of the building a second time. (Def. Ex. A at 12:17:00-12:17:12, 2:05-2:17.) Ryder did not indicate on any of the doors on the upper level. (Hagarty Hr'g Test. at 41.)

Officer Hagarty and Ryder returned to the middle level of the apartment building. (Def. Ex. A at 12:17:13-12:17:16, 2:18-2:21.) On the middle level, Ryder initially

9

circled past both doors and whined.[6]  Then, Officer Hagarty directed Ryder to sniff at the seams of apartment 2 again.  Ultimately, Ryder attempted to sit again,[7] whined, and then fully sat down in front of the door to apartment 2.  Officer Hagarty verbally rewarded Ryder after he sat down.  (*Id.* at 12:17:17-12:17:40, 2:21-2:45.)

Next, Officer Hagarty and Ryder went down to the lower level of the building.  Ryder quickly circled the two doors on the lower level and then returned back up to the middle level.  Officer Hagarty directed Ryder back down the stairs to the front door of the apartment building and he and Ryder exited the building.  Outside the building, Officer Hagarty, again, verbally praised Ryder.  (*Id.* at 12:17:41-12:18:12, 2:46-3:17.)  Officer Hagarty stated that Ryder ran back up to the middle level of the apartment building because he was frustrated and wanted to bring Officer Hagarty back to where he had smelled the narcotics in order to receive his reward.  (Hagarty Hr'g Test. at 44.)  Officer Hagarty also stated that he does not always give Ryder his ball as a reward and sometimes only provides a verbal reward so that Ryder is not always expecting the same reward.  (*Id.* at 44-45.)

Officer Hagarty testified that he had no doubt that Ryder indicated on apartment 2.  (*Id.* at 45.)  Officer Hagarty also testified that based on both his experience at the time of the dog sniff on September 11, 2023 and his observations of the body camera video, Ryder sat in front of apartment 2, indicating the presence of narcotics.  (*Id.*)

---

[6] At times while Ryder was circling past the two doors on the middle level of the apartment building, because Officer Hagarty's body camera shoots from his chest, Ryder is not visible on the body camera.

[7] Def. Ex. A at 12:17:26-12:17:27, 2:31-2:32.  Officer Hagarty testified that this portion of the video demonstrates that Ryder went up to the door for Apartment 2, sniffed and then started going into a sit position.  Officer Hagarty further testified that Ryder was once again alerting/indicating on Apartment 2.  (Hagarty Hr'g Test. at 42-43.)

### B.       *Training and Performance of Officer Hagarty and Ryder*

Ryder is certified by the National Tactical Police Dog Association.  (Government Exhibit 2.)  He was most recently re-certified in August 2023.  (Hagarty Hr'g Test. at 22.)  Ryder is a dual-purpose canine, meaning he is trained in tracking, apprehensions, article searches, and narcotic detection.  (*Id.* at 20.)  Ryder is trained to detect marijuana, methamphetamine, heroin, and cocaine.  (*Id.* at 24.)  Officer Hagarty explained that, when Ryder detects the odor of narcotics, he shows different changes of behavior, such as head snapping, multiple breaths through his nose, and tail wagging.  (*Id.*)  Ryder is also trained to sit when he detects the odor of narcotics.  (*Id.* at 26.)  According to Officer Hagarty, Ryder does not have to sit in order for Officer Hagarty to know that Ryder has detected the odor of narcotics because he has learned to recognize, through his training and time with Ryder, different changes that Ryder shows when Ryder is in the odor of narcotics.  (*Id.*)  If Ryder identifies the odor of narcotics he is verbally rewarded or rewarded with a ball.  (*Id.* at 24.)  Officer Hagarty described Ryder as a hard-working, driven dog that is energetic and likes to work fast.  (*Id.* at 24-25.)  Officer Hagarty indicated that, because Ryder is energetic and likes to work fast, he sometimes skips an area or skips a door and must be redirected to an area or doorway.  (*Id.* at 25.)

The CRPD has a 16-hour monthly training requirement.  (*Id.* at 22.)  Officer Hagarty and Ryder train with the other members of the CRPD Canine Unit.  Training generally lasts the entire day and one of the canine handlers from the unit is chosen to lead the training by devising with various scenarios focusing on tracking, narcotics detection, apprehension, or article searches.  (*Id.* at 23.)  Officer Hagarty testified that Ryder does well in training, and he has no concerns with Ryder's performance and reliability in training.  Similarly, Officer Hagarty stated that Ryder also does well in the field, and he has no concerns with Ryder's performance and reliability in the field.  (*Id.*)

## C. Sergeant Trimble's Testimony

Sergeant Trimble testified that a canine handler is in the best position for determining whether his or her dog alerted or indicated for the odor of narcotics. Sergeant Trimble explained that the handler spends the most time with a dog, works with the dog the most, and has observed every alert/indication that his or her dog has performed. (Trimble Hr'g Test. at 87.) Sergeant Trimble also testified that, while a drug dog is trained to sit when the dog detects the odor of narcotics, a full sit is not always necessary. Sergeant Trimble explained that dogs can freeze up depending upon the environment they are in, such as the amount of odor, the stability of the area they are working, how crowded the area is, and whether there is room to fully sit. Sergeant Trimble stated that a dog has a "unique proprioception," an awareness of its body such that its tail or rear end touches something, it may interpret that feeling as sitting. Sergeant Trimble also noted that it is not just the indication itself, but also the behavior leading up to an alert/indication which the handler reads to determine whether his or her dog has detected the odor of narcotics. (*Id.* at 88-89.) Sergeant Trimble testified that he has no concerns about Officer Hagarty or Ryder in their performance regarding canine deployments and work. (*Id.* at 90.)

## D. Jerry Potter's Testimony

Jerry Potter was called to testify by Defendant. Mr. Potter has extensive experience in the military and as a commercial dog trainer and handler. While his experience is set forth in detail in Defendant's Exhibit D, I will note here that his dog-training experience dates to the 1990s and appears to include significant relevant experience in narcotics detection. He has testified on numerous occasions at the request of criminal defendants. Although he has not been called to testify on behalf of law enforcement, his resume notes that he has often provided feedback to attorneys that was favorable to law enforcement.

Mr. Potter was critical of Ryder's participation in training. While the CRPD requires 16 hours of training per month, Mr. Potter opined that Ryder was not actively engaged in training to that extent and, even if Ryder were actively engaged as outlined in training records, Ryder did not meet the 16-hour requirement in four separate months.

While watching Officer Hagarty's body camera video in Court, Mr. Potter testified regarding the September 11, 2023 dog sniff. While reviewing 12:16:14 and 1:19 of the video (Def. Ex. A) defense counsel and Mr. Potter engaged in the following colloquy:

Q:     Right there. Okay. And that's at 12—12:16:14. So that was—can you describe what that was?

A:     That was him targeting an area to Ryder, saying check here with a hand presentation.

Q:     And did you see a head snap?

A:     No.

Q:     Did you see his head move at all?

A:     He went in, he sniffed, then he turned away.

Q:     So the description by Officer Hagarty that Ryder worked to the right of the door, he snapped his head back to the left side seam of the door, continuing to sniff and started to go to a sit, did you see that there?

A:     No.

Q:     Did you see him ever start to go to a sit?

A:     No.

Q:     Did you see him pressed up against the wall so as he wouldn't be able to sit?

A:     No.

Q:     Did you see Ryder look up towards Officer Hagarty, since it was a confined area, for his reward?

A:     I did see him look at Officer Hagarty.

Q:     And is it your understanding it was at this point that Officer Hagarty was describing in his testimony that Ryder attempted to sit?

A:     Yes.

Q:      All right.   And—but you don't see anywhere in there that that occurred?

A:      No.

(Potter Hr'g Test. at 142-43.)[8]

Mr. Potter was critical of Officer Hagarty's overall approach to the dog sniff in the apartment building.  Mr. Potter suggested that, at times, Officer Hagarty was creating a negative experience for Ryder and confusing Ryder by making him run through the apartment complex multiple times.  Mr. Potter also opined that Ryder did not appear interested in any of the doors in the apartment building.

Mr. Potter testified that, when Ryder sat on the middle floor of the apartment building, *see* Def. Ex. A at 12:17:32-12:17:40; 2:37-2:45, he believed Officer Hagarty "cued" Ryder to sit.  (Potter Hr'g Test. at 153.)  Mr. Potter explained that by Officer Hagarty choking Ryder "up on the leash, tugging him over to Door Number 2, stopping his fluid movements, standing over Ryder, Ryder looking to him and seeing dad standing still, so I'm going to go ahead and sit.  I believe that was a 100 percent cued sit out of Ryder."  (*Id.* at 153-54.)

Mr. Potter was also critical of Officer Hagarty's handling of the methamphetamine found on Defendant prior to the free-air drug sniff at the apartment building.  Mr. Potter testified that Officer Hagarty's leather gloves appear to have hole in one of the left-hand

---

[8] Officer Hagarty was referring to portion of the body camera video at 12:15:49-12:16:07 and 00:54-1:12 when he testified that: (1) Ryder bypassed the door on the right; (2) he circled and bypassed the door on the right again; (3) he sniffed the door across on the left; (4) he passed by the door on the right again; (5) he is directed to sniff the door on the right; (6) he sniffed the bottom left door seam, worked across the door, and snapped his head back toward the left door seam; and (7) he started to go into a sit, but did not go into a full sit because he was too close to the wall.  Mr. Potter's testimony quoted above, however, is about the 12:16:14, 1:19 mark of the body camera video.  A review of Def. Ex. A at 12:15:49-12:16:07, 00:54-1:12, *not discussed* by Mr. Potter at any point in the hearing, is consistent with Officer Hagarty's testimony described in this footnote.

fingers. *See* Def. Ex. F at 11:30:32-11:30:33; 2:19-2:20. He opined that Officer Hagarty's handling of the narcotics and placing the narcotics in the front passenger seat of his car, transferred the odor of narcotics to Ryder, "destroy[ing] . . . [Ryder's] ability to smell for the next several hours." (Potter Hr'g Test. at 160.) Mr. Potter further opined that the odor contamination from the drugs in Officer Hagarty's vehicle "completely invalidate[d] the dog sniff." (*Id.* at 161.) Mr. Potter testified that he did not believe Ryder indicated to the presence of narcotics at apartment 2 because Ryder was incapable of indicating the presence of narcotics due to Officer Hagarty's handling of drugs and placing the drugs in his vehicle immediately prior to the dog sniff. (*Id.* at 162.)

## III. DISCUSSION

### A. Parties' Arguments

#### 1. Defendant's arguments

Defendant argues that "[t]here is nothing in this case that supports the alleged 'alert' of Ryder." (Doc. 24-1 at 3.) Specifically, Defendant asserts that nothing on Officer Hagarty's body camera video (Def. Ex. A) "shows an objective alert." (*Id.*) Defendant contends that the body camera video demonstrates "improper cuing by the handler to keep the attention of Ryder on door number Two." (*Id.* at 4.) Defendant maintains that per the body camera video, Ryder "passed by the door to Apartment 2 eight times without alerting in any manner." (*Id.*) Defendant argues that "[i]t was only when Officer Hagarty yanked [Ryder's] leash that Ryder finally sat," and, therefore, "Ryder did not work independently of Officer Hagarty." (*Id.* at 4-5.) Defendant concludes that "[t]here is no discernable 'alert' by Ryder, and Officer Hagarty's actions made the dog sniff by Ryder unreliable." (*Id.* at 5.)

Defendant also argues that the search warrant for apartment 2 lacked probable cause and any nexus to illegal activity, and, therefore, violated the Fourth Amendment.

(*Id.* at 7.)  Specifically, Defendant asserts that the search warrant affidavit: (1) provided no nexus between Defendant and apartment 2; (2) was devoid of any showing of suspicious activity in or around apartment 2; and (3) failed to establish facts from which a magistrate could reasonably determine that the items sought in the search warrant application would be found in apartment 2.  (*Id.* at 8.)

Further, Defendant argues that the good faith exception articulated in *United States v. Leon*, 468 U.S. 897 (1984) is inapplicable to the execution of the search warrant in this matter.  (*Id.* at 9.)  Defendant maintains that the search warrant affidavit "is a vacuum that dramatically leaps from an unnamed narcotics investigation to apartment 2 with no intervening facts and no mention of [Defendant]."  (*Id.* at 10.)  Defendant asserts that "[t]he sole allegation of illegal activity comes from the faulty dog sniff by the same officer who conducted the dog sniff and who is writing the affidavit" and the deterrence of police misconduct would not be achieved "if police are permitted to use unreliable information in support of the search warrant affidavit."  (*Id.*)

In his Reply Brief, Defendant, for the first time, argues that "[t]he deployment of a drug sniffing dog within inches of the apartment door, in a locked building, was an unlawful search."  (Doc. 30 at 1.)  Relying on *Florida v. Jardines*, 569 U.S. 1 (2013), Defendant asserts that his Fourth Amendment rights were violated, "when law enforcement, using a drug sniffing dog, entered a locked building, came within inches of the apartment door, and used the dog to search for the smell of narcotics."  (*Id.*)  Defendant contends that Ryder unlawfully entered the curtilage of apartment 2.  (*Id.* at 2.)  Relying on three of the four factors outlined in *United States v. Dunn*, 480 U.S. 294 (1987) for determining whether an area associated with a residence is curtilage, Defendant argues that: (1) "[t]he first factor—proximity to the home—strongly supports a finding that the area of the dog sniff was curtilage" because the "dog sniff was within inches of Apartment 2's front door"; (2) "[t]he second factor—whether the area was

16

included within an enclosure surrounding the home—also supports a finding that the area was curtilage" because "Apartment 2's door was in a locked building"; and (3) "[t]he final factor—steps taken by the resident to protect the area from passersby—also supports that the area is curtilage" because the "entrance to the building, the only way to access Apartment 2, was locked." (*Id.* at 2-3.)

Alternatively, Defendant argues that, if the Court "determines that the area was not curtilage, [the Court] should find that the dog sniff violated [Defendant's] reasonable expectation of privacy." (*Id.* at 3.) Relying on Justice Kagan's concurrence in *Jardines*, Defendant argues that "a dog sniff outside of a home violate[s] the resident's reasonable expectation of privacy." (*Id.*) Defendant directs the Court to *United States v. Whitaker*, 820 F.3d 849 (7th Cir. 2016). Defendant states that, in *Whitaker*, law enforcement, after receiving a tip from a confidential informant, entered a locked apartment building, conducted a dog sniff on the defendant's apartment door, obtained a search warrant based on the dog's alert on the apartment door, and discovered contraband after executing the search warrant. (*Id.* at 4.) Defendant points out that the Seventh Circuit Court of Appeals "found that the drug dog sniff violated the defendant's reasonable privacy expectations based upon Justice Kagan's concurrence in *Jardines*." (*Id.*) Defendant asserts that "[t]his Court should follow *Whitaker* and find that the use of a drug sniffing dog within inches of Apartment 2's front door violated [Defendant's] reasonable expectation of privacy." (*Id.* at 5.)

In his "Reply to Government's Supplemental Resistance," Defendant states:

> The government and Court raised the issue of a *Franks* hearing at the beginning of the motion to suppress hearing. [Defendant] believes he complied with the requirements of *Franks* by presenting the search warrant affidavit and video of the canine sniff with this opening brief. The deliberate falsehood is contained in the search warrant affidavit that . . . Ryder "sat down facing apartment 2." The video of the canine sniff was the offer of proof that directly contradicts that sworn statement and was

17

contained in the opening brief. [Defendant] was entitled to a hearing on that matter. The Court should consider that falsehood in determining that the search warrant affidavit was unsupported and therefore suppression of the evidence is the appropriate remedy.

(Doc. 37 at 1.)

Defendant also argues that the Court should not find that Defendant waived his arguments that the dog sniff was unlawful and violated his reasonable expectation of privacy. (*Id.* at 2.) Defendant maintains that good cause exists for these arguments to be considered. (*Id.*) Defendant asserts that he "did not fail to raise the additional grounds for suppression as a calculated tactical decision," but that he "raised these arguments as soon as practicable given counsel's ability to research and competently present the issues prior to the suppression hearing." (*Id.*) Defendant contends that good cause exists for consideration of "belatedly-raised" arguments for the following reasons: (1) defense counsel requested the dog sniff video on March 12, 2024 but did not get the video until April 12, 2024; (2) Defendant requested an extension of the pretrial motions deadline to April 22, 2024 but was granted an extension to April 15, 2024; (3) on April 12, 2024, Defendant received a proposed plea agreement that was revised on April 14, 2024; (4) on April 15, 2024, defense counsel traveled to the Marshall County Jail to meet with Defendant regarding the dog sniff video and plea agreement; (5) defense counsel was not able to research and brief the motion to suppress until she returned from meeting with Defendant on April 15, 2024; and (6) "after filing the opening brief, counsel had more time to fully research the suppression issues in the case and at that time determined there were additional bases for suppression that should be raised." (*Id.* at 2-3.) Defendant also argues that the Government is not prejudiced by the belatedly raised issues because the Government had the opportunity to respond and brief the issues post hearing. (*Id.* at 3-4.) Defendant contends, on the other hand, that he would be prejudiced if the Court

Case 1:24-cr-00011-CJW-MAR   Document 40   Filed 07/08/24   Page 18 of 60

declined to consider all the arguments raised in both his opening brief and reply brief. (*Id.* at 4.)

### 2. Government's arguments

In its Resistance, the Government argues that, based on Defendant's argument in his opening brief, he should have requested a *Franks* hearing. (Doc. 27-1 at 5.) *See Franks v. Delaware*, 438 U.S. 154 (1978). The Government points out that in order to obtain a *Franks* hearing, a defendant must "make a 'substantial preliminary showing' that the warrant affidavit contained an 'intentional or reckless false statement or omission which was necessary to the finding of probable cause,' a requirement 'not easily met.'" (*Id.* at 7.) (Quoting *United States v. Blair*, 93 F.4th 1080, 1084 (8th Cir. 2024), in turn quoting *United States v. Snyder*, 511 F.3d 813, 816 (8th Cir. 2008)). The Government maintains that Defendant is not entitled to a *Franks* hearing because Defendant "has offered no information other than counsel's interpretation of the behavior of the canine" and "has provided no information or affidavits from an expert or anyone else that has been trained on the use of a canine." (*Id.*)

Next, the Government argues that the search warrant application provided probable cause based on Ryder's indication on apartment 2. (*Id.* at 8.) The Government also asserts that the record in this case contains documents demonstrating that Ryder is a certified and reliable drug dog.[9] (*Id.* at 9.)

---

[9] In his opening brief, Defendant asserted that "[t]he Government has not yet provided training records in this case," and, therefore, "any 'alert' by Ryder was not sufficiently reliable to provide a basis for probable cause for the search warrant for the apartment." (Doc. 24-1 at 6-7.) In its Resistance, the Government states that "Defendant notes that at the time of briefing training records had not been provided by the government. Those records have now been provided and show that Ryder is certified and reliable." (Doc. 27-1 at 9.) The Government also points out that "Defendant requested these records at 5:13 p.m. on April 15, 2024, and his motion was filed that same date at 6:33 p.m." (*Id.* at 9, n.4.)

Further, the Government argues that, while Defendant contends that the affidavit attached to the search warrant application may have lacked probable cause that Defendant was involved in drug possession or drug trafficking, Defendant's contention is misplaced because the proper issue in this case is "whether or not there was probable cause to search the apartment." (*Id.* at 10.) The Government maintains that "[t]he warrant in this case was not based on who lived there but instead on the canine alert, so defendant's connection to the apartment is irrelevant for the determination of probable cause based on the four corners of the warrant where the warrant sought to search the apartment not defendant." (*Id.* at 11-12.)

Additionally, relying on *Leon*, the Government argues that even "if the Court finds Ryder did not sit, the Court could find *Leon* applies if it finds Officer Hagarty reasonably believed the dog sufficiently alerted." (*Id.* at 14.)

In its Supplemental Resistance, the Government argues that Defendant waived any argument not raised in the opening brief for his motion to suppress as untimely. (Doc. 36 at 5.) Specifically, the Government asserts that Defendant's argument that "the deployment of a drug sniffing dog outside the apartment door was an unlawful search and [D]efendant had a reasonable expectation of privacy in the area outside his apartment door," raised for the first time in his reply brief, is untimely and waived. (*Id.* at 5-6.) The Government also points out that the newly raised argument in the reply brief did not address newly decided authority or respond to any arguments in the Government's resistance brief as required by Local Rule. (*Id.* at 6.)

Alternatively, the Government argues that, if the Court does not find Defendant's newly raised argument waived, the Court "should find based on the Eighth Circuit caselaw that the canine search outside the apartment door was lawful and [D]efendant did not have a reasonable expectation of privacy." (*Id.* at 7.) (Citing *United States v. Cage*, No. 23-cr-334 (MJD/TNL), 2024 WL 1136793 (D. Minn. Mar. 15, 2024)). The

20

Government also argues that of the four factors to be considered for determining whether the area outside of a residence is curtilage, only the first factor—proximity—favors curtilage. (*Id.* at 9.) The Government maintains that the three other factors support a finding that Defendant had no expectation of privacy outside his apartment door. Finally, the Government argues that "[e]ven if this [C]ourt determines that the search was illegal, based on good-faith, it need not suppress the evidence." (*Id.* at 10.) Relying on *United States v. Perez*, 46 F.4th 691 (8th Cir. 2022), which held, among other things, that based "on the state of our caselaw at the time of the search, we find that the good faith exception applies" and it "was reasonable for the officers to rely on our then-applicable precedent that dog sniffs at an interior apartment door are permissible," *id*. at 698, the Government asserts that Officer Hagarty had a good faith reliance on past caselaw to perform the dog sniff in the apartment complex. (Doc. 36 at 11.)

**B.    Analysis**

    *1.    Franks issues*

        *a.    Relevant law*

Under *Franks*, an affidavit in support of a search warrant is presumed valid.  438 U.S. at 171; *see also United States v. Randle*, 39 F.4th 533, 537 (8th Cir. 2022); *United States v. Hollis*, 245 F.3d 671, 673 (8th Cir. 2001).  A defendant is entitled to a hearing under *Franks* when he or she "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause."  438 U.S. at 155-56; *see also United States v. Hansen*, 27 F.4th 634, 637 (8th Cir. 2022) ("To receive a *Franks* hearing, 'a defendant must make a substantial preliminary showing that there was an intentional or reckless' omission from a warrant affidavit that 'was necessary to the finding of probable cause.'") (Quoting *United States v. Snyder*, 511 F.3d 813, 816 (8th Cir. 2008))).  "This

21

substantiality requirement is not met lightly and requires a defendant to offer specific allegations along with supporting affidavits or similarly reliable statements." *Hansen*, 27 F.4th at 637 (quoting *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015)). Indeed, "[a] mere allegation standing alone, without an offer of proof in the form of a sworn affidavit of a witness or some other reliable corroboration, is insufficient to make the difficult preliminary showing." *United States v. Short*, 2 F.4th 1076, 1080 (8th Cir. 2021) (quoting *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998)).

To make a showing of reckless disregard for the truth, the defendant must show that the affiant "must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information" he reported. *United States v. Reed*, 921 F.3d 751, 756 (8th Cir. 2019) (quoting *United States v. Conant*, 799 F.3d 1195, 1200 (8th Cir. 2015)). "Recklessness can be inferred from [an] omission 'when the material omitted would have been clearly critical to the finding of probable cause.'" *Id.* (quoting *Conant*, 799 F.3d at 1200). If the defendant fails to make "a 'strong initial showing' of deliberate falsehood or reckless disregard for the truth," a *Franks* hearing "must be denied." *United States v. Freeman*, 625 F.3d 1049, 1052 (8th Cir. 2010) (quoting *United States v. Pennington*, 287 F.3d 739, 743 (8th Cir. 2002)).

If a defendant is able to make the requisite preliminary showing to warrant a *Franks* hearing, then at the *Franks* hearing, the defendant must establish: "(1) that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit; and (2) that the affidavit's remaining contents is insufficient to establish probable cause."[10] *Conant*, 799 F.3d at 1199 (quoting *United States v. Reinholz*,

---

[10] A similar analysis is employed for omissions. "The defendant must show: (1) that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *Conant*, 799 F.3d at 1200 (quoting *Reinholz*, 245 F.3d at 774).

245 F.3d 765, 774 (8th Cir. 2001)). "[N]egligence or innocent mistake is not enough to establish a *Franks* violation." *Freeman*, 625 F.3d at 1050-51 (quoting *United States v. Butler*, 594 F.3d 955, 961(8th Cir. 2010)). Only if the defendant can meet this burden will the "search warrant . . . be voided [under *Franks*] and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Butler*, 594 F.3d at 961.

### b.    Application

Defendant did not make a preliminary showing entitling him to a *Franks* hearing. Indeed, Defendant did not even attempt to make a preliminary showing. Defendant makes no specific allegations corroborated by an affidavit or other reliable statements. *See Hansen*, 27 F.4th at 637. Defendant simply argues that Ryder did not alert on apartment 2 and Officer Hagarty's body camera video proves this. (Doc. 24-1 at 3-5.) Defendant maintains that the body camera video is enough to make a preliminary showing. (Doc. 37 at 1.) Specifically, Defendant contends that the "video of the canine sniff was the offer of proof that directly contradicts" Officer Hagarty's sworn statement that Ryder "sat down facing apartment 2." (*Id.*) Defendant cites no authority for the proposition that a video, unaccompanied by any supporting affidavit, can be the basis for a *Franks* hearing. Assuming without deciding that the content of a video can so contradict the content of a warrant application, that no other offer of proof is necessary, Defendant's proof still fails. The problem with Defendant's argument is that Officer Hagarty's body camera video shows Ryder sitting outside Apartment Door Number 2. Perhaps Ryder is not directly facing the door to apartment 2, but it is indisputable that Ryder sits outside the door. Defendant's expert, Mr. Potter, did not provide an affidavit and produced no report regarding his opinions. In fact, Mr. Potter's opinions were not provided until the hearing in this case. Thus, Defendant's argument, prior to the hearing in his opening brief, is nothing more than a mere allegation which lacks an offer of proof, such as a

23

sworn affidavit of a witness or other reliable corroboration, and is, therefore, insufficient to make the difficult preliminary showing. *See Short*, 2 F.4th at 1080. Here, the video by itself is not "other reliable corroboration" in and of itself. It does not, for example, show Ryder sitting outside a door marked "314," show that Ryder never left the patrol car, or show some other widely divergent version of the events described in Officer Hagarty's affidavit. At best, the video provides a frame upon which Mr. Potter was able to fit a different interpretation of evens, not proof of a "false statement knowingly and intentionally, or with reckless disregard for the truth." *Conant*, 799 F.3d at 1199. Accordingly, I find that Defendant was not entitled to a *Franks* hearing and recommend that the motion to suppress be denied on the basis of any knowing or recklessly false statement or omission.

Alternatively, even if Defendant had made a preliminary showing entitling him to a *Franks* hearing—which he did not make—Defendant cannot establish that Officer Hagarty made "a false statement knowingly and intentionally, or with reckless disregard for the truth" in the search warrant affidavit. Indeed, at the hearing I asked Mr. Potter "[c]an you tell me if there was anything about what you know that Officer Hagarty put in his application for a search warrant that you believe constitutes a deliberate falsehood?" Mr. Potter replied:

> I—I don't know that I would constitute them as deliberate. I would say that they were maybe sloppy or—I don't think Officer Hagarty had any mal-intent in anything that he did. I think maybe there was a certain amount of inexperience in his handling of those narcotics. Maybe he didn't deem—possibly didn't deem certain information relevant from one time to the next. I do believe there was inaccurate information put into things, whether that was intentional or with malice or not, I can't say. I would hope there wasn't.

(Potter Hr'g Test. at 190-91.) I also asked Mr. Potter whether there was "anything that [Officer Hagarty] put in there that you believe was true that he recklessly disregarded

when he formulated his affidavit?" (*Id.* at 191.)  Mr. Potter responded that he believed Officer Hagarty "intentionally" left out interest Ryder displayed at other doors in the apartment building,[11] including head snaps and extra sniffing at other doors in the building that Mr. Potter states that he saw on the body camera video. (*Id.*)  Mr. Potter also noted that Ryder "never sat facing the door." (*Id.*)

Here, Mr. Potter testified that Officer Hagarty did not provide "deliberate" falsehoods or have "mal-intent" in drafting the search warrant affidavit.  While Mr. Potter opined that his review of the body camera video indicated Ryder had interest in doors other than apartment 2 (or maybe the same interest in all the doors in the building), Officer Hagarty testified that Ryder did not alert or indicate on either door on the lower level or the upper level of the building.  (Hagarty Hr'g Test. at 38, 41.)  Moreover, unlike at apartment 2, Ryder did not attempt to sit or actually sit outside any door on the lower level or the upper level.  Significantly, Officer Hagarty noted multiple changes of behavior by Ryder when he sniffed the door of apartment 2.  Officer Hagarty testified that: (1) After Ryder's first sniff of the door for apartment 2, Ryder had a head snap and attempted to sit; (2) after Ryder's second sniff of the door for apartment 2, Ryder had a head snap; (3) after Ryder sniffed the doors on the upper level of the building, at which point Ryder had sniffed all the doors in the building, Officer Hagarty paused to make a note that Ryder had behavioral changes at apartment 2; and (4)  after Ryder's third sniff of the door for apartment 2, Ryder attempted to sit and then fully sat in front of apartment 2.  (*Id.* at 38-43.)  Officer Hagarty also testified that he had no doubt Ryder alerted/indicated at apartment 2.  (*Id.* at 45.)  Based on the foregoing, it is clear that Officer Hagarty did not believe Ryder alerted/indicated on any door other than the door

---

[11] I note that Mr. Potter also testified that Ryder showed the same interest in all of the doors in the apartment building.  (Potter Hr'g Test. at 153; "But for the most part, [Ryder] showed almost the same interest in almost all of the doors throughout the entire time that he was working the building.")

to apartment 2. Furthermore, the only door where Ryder attempted to sit or actually sat was outside apartment 2.

Under such circumstances, it is unsurprising that Officer Hagarty did not discuss Ryder's behavior outside the other doors in the search warrant affidavit. The evidence in the record certainly does not rise to the level of Officer Hagarty knowingly and intentionally making a false statement or making a statement with reckless disregard for the truth. Moreover, even though Ryder does not appear to directly face the door of apartment 2 when he sits, as Officer Hagarty stated in the search warrant affidavit, Ryder clearly sits outside the door of apartment 2. Again, this alleged error in drafting the search warrant affidavit, even if it is indeed an error, does not rise to the level of Officer Hagarty knowingly and intentionally making a false statement or making a statement with reckless disregard for the truth. *See Freeman*, 625 F.3d at 1050-51 ("[N]egligence or innocent mistake is not enough to establish a *Franks* violation.") (Quotation omitted). Accordingly, I find that Defendant has not established a *Franks* violation and recommend that the motion to suppress be denied on this basis.

### 2.    *Reliability of the sniff*

#### a.    **Harris** *probable-cause determination*

Whether Ryder is a reliable drug dog and whether his alert was reliable in this case are issues briefed by the parties, but they may not be well framed for analysis. As discussed below, "[i]f a bona fide organization has certified a dog after testing his [or her] reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Florida v. Harris*, 568 U.S. 232, 256-47 (2013).

Normally, it is not this Court's place to make a de novo determination of whether affidavits supporting search warrants are supported by probable cause. "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo

review. A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (citation and internal quotation marks omitted). "In reviewing the issuance of a warrant, a district court need not make a de novo inquiry into the existence of probable cause, but rather should uphold the decision to issue the warrant so long as it is supported by 'substantial evidence in the record.'" *United States v. Hallam*, 407 F.3d 942, 948 (8th Cir. 2005) (quoting *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984) (per curiam)); *see also United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986) ("[T]he decision to issue the warrant is to be upheld if supported by substantial evidence on the record."). "When a magistrate relies solely on an affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2014) (citation and internal quotation marks omitted). Therefore, "[r]eviewing courts must give substantial deference to the original determination of probable cause made by the judge who issued the warrant, and that determination will not be set aside unless the issuing judge lacked a substantial basis for concluding that probable cause existed." *United States v. Edmiston*, 46 F.3d 786, 788 (8th Cir. 1995) (citing *Gates*, 462 U.S. at 238–39).

Cases where probable cause is founded on a sniff by a drug dog, however, are somewhat exceptional. *Harris* held, "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. 568 U.S. 237, 246–47 (2013). This presumption, however, is subject to rebuttal. *Harris* continued:

> *A defendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses.* The defendant, for example, may contest the adequacy of a certification or training program,

perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings. Indeed, evidence of the dog's (or handler's) history in the field, although susceptible to the kind of misinterpretation we have discussed, may sometimes be relevant, as the Solicitor General acknowledged at oral argument. See Tr. of Oral Arg. 23–24 ("[T]he defendant can ask the handler, if the handler is on the stand, about field performance, and then the court can give that answer whatever weight is appropriate"). And even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions.

*Id.* at 247–48 (emphasis added.) Unlike the case at bar, *Harris* did not mention a search warrant and it appears the search of the vehicle in question occurred immediately after the dog alerted, perhaps a warrantless search pursuant to the automobile exception. I see no reason, however, that if, "a defendant . . . must have an opportunity to challenge such evidence of a dog's reliability," as required by *Harris,* that opportunity should be negated by the issuance of a warrant, at least in the instant case. Here, even though law enforcement obtained a warrant, that warrant relied heavily on the presumed reliability of certified dog's alert. In fact, the Eighth Circuit Court of Appeals has afforded defendants the opportunity to challenge the presumption of probable cause founded on a drug dog's sniff, even where law enforcement obtained a warrant. In *United States v. Gonzalez*, for example, the Eighth Circuit permitted a defendant to challenge a drug dog's qualifications following a warranted search without a showing under *Franks* regarding a knowing or reckless error or omission regarding those qualifications. 781 F.3d 422, 429 (8th Cir. 2015). It appears that *Gonzalez* allows judges to rely on the *Harris* presumption at the warrant stage, and, if the warrant is challenged, determine at a "probable-cause hearing" if the evidence undermines the presumption sufficiently to destroy probable cause. As *Harris* described the task at hand:

In short, a probable-cause hearing focusing on a dog's alert should proceed much like any other. The court should allow the parties to make their best case, consistent with the usual rules of criminal procedure. And the court should then evaluate the proffered evidence to decide what all the circumstances demonstrate.

*Harris*, 568 U.S. 237, 247–48 (2013). Thus, *Harris* permits defendants to challenge at a probable-cause hearing a dog's qualifications and the "circumstances surrounding a particular alert may undermine the case for probable cause." Here, Defendant challenges both Ryder's qualifications and the circumstances surrounding the search.

### b.    Relevant law

In *Florida v. Harris*, the Supreme Court held that "[i]f a bona fide organization has certified a dog after testing his [or her] reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." 568 U.S. 237, 256-47 (2013); *see also United States v. Rederick*, 65 F.4th 961, 967 (8th Cir. 2023) ("'[A]n alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle.' *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010).") (alteration in original); *United States v. Jackson*, 811 F.3d 1049, 1052 (8th Cir. 2016) ("The positive alert by a reliable drug dog alone establishe[s] probable cause."). "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his [or her] alert." *Harris*, 568 U.S. at 246. "An affidavit 'need only state the dog has been trained and certified to detect drugs' and 'need not give a detailed account of the dog's track record or education.'" *Jackson*, 811 F.3d at 1052 (quoting *United States v. Lakoskey*, 462 F.3d 965, 978 (8th Cir. 2006)); *see also Rederick*, 65 F.4th at 967 ("A drug detection dog is considered reliable when it has been trained and certified to detect drugs") (quotation omitted); *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999) ("To establish the dog's reliability, the affidavit need only

state the dog has been trained and certified to detect drugs."). "Even if a drug dog's performance record raised questions about his reliability . . . the issue is whether the totality of the circumstances present at the scene provided probable cause to search." *Rederick*, 65 F.4th at 967 (quotation omitted). Thus, "[t]he question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test." *Harris*, 568 U.S. at 248.

### c. Application

Regarding Ryder's reliability, Defendant's primary argument is that the Government failed to provide certification records for Ryder and therefore Ryder could not be considered a reliable dog. (Doc. 24-1 at 5-7.) In response, the Government stated that, following Defendant's opening brief, it provided Defendant with records showing that Ryder was certified and reliable. (Doc. 27-1 at 9.) The record in this case demonstrates that, on April 29, 2022, Ryder was certified by the Tarheel Canine Training, Inc. for, among other things, narcotics detection. (Gov. Ex. 2; Doc. 27-2 at 3.) Ryder's certification provided a 100% correct hit rate on drugs, including heroin, cocaine, methamphetamine, and marijuana located in a warehouse, vehicles, rooms, parcels, and open area. (*Id.*; Doc. 27-2 at 7-8.) On September 15, 2022, Ryder was re-certified by the National Tactical Police Dog Association, again, in, among other things, narcotics detection. (*Id.*; Doc. 27-2 at 1-2.) Further, at the hearing, Officer Hagarty testified that Ryder was re-certified again in August 2023. (Hagarty Hr'g Test. at 22.) Accordingly, under *Harris* and based on the foregoing, I find Ryder to be a reliable drug dog at the time of the apartment search. 568 U.S. at 256-47 ("If a bona fide organization has certified a dog after testing his [or her] reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides

probable cause to search"); *see also Rederick*, 65 F.4th at 967 ("A drug detection dog is considered reliable when it has been trained and certified to detect drugs") (quotation omitted); *Jackson*, 811 F.3d at 1052 ("An affidavit need only state the dog has been trained and certified to detect drugs and need not give a detailed account of the dog's track record or education") (quotation omitted); *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999) ("To establish the dog's reliability, the affidavit need only state the dog has been trained and certified to detect drugs."). To the extent that Mr. Potter was critical of Ryder's participation in training for the 16-hour monthly training requirement, this general concern does not alter the determination of Ryder's reliability or probable cause.

Defendant also asserts that Ryder's alert/indication on apartment 2 was unreliable because Officer Hagarty engaged in cueing, that is, Officer Hagarty "yanked" or "tugged" on Ryder's leash to get him to sit outside apartment 2. (Doc. 24-1 at 4-5.) Mr. Potter also testified that he believed Officer Hagarty cued Ryder to sit. (Potter Hr'g Test. at 153.) Specifically, Mr. Potter testified that by Officer Hagarty choking Ryder "up on the leash, tugging him over to Door Number 2, stopping his fluid movements, standing over Ryder, Ryder looking to him and seeing dad standing still, so I'm going to go ahead and sit. I believe that was a 100 percent cued sit out of Ryder." (*Id.* at 153-54.)

The pertinent body camera footage is at Def. Ex. A at 12:17:14-12:17:34, 2:19-2:39. The alleged "yank" or "tug" takes place at Def. Ex. A at 12:17:32-12:17:33, 2:37-2:38.

There are several problems with Defendant's argument regarding cueing. First, the body camera video is not conclusive that Officer Hagarty "yanked" or "tugged" at Ryder's leash to make him sit. The video shows that Officer Hagarty moved the leash before Ryder sat. Was the movement a "yank," a "tug," a "pull?" It is difficult to say. What was the purpose of the "yank," "tug," "pull," movement of the leash? Was it to

31

cue Ryder to sit? Was it to direct Ryder to the door across from the door to apartment 2? It is not obvious from the video that Officer Hagarty cued Ryder to sit. Second, based on the record before me, there is no evidence that Officer Hagarty knew that Defendant resided in apartment 2. When Investigator Magill directed Officer Hagarty to perform a free-air dog sniff at the apartment building, he purposely did not disclose to Officer Hagarty which apartment belonged to Defendant. It raises the question why Officer Hagarty would have cued Ryder to sit outside apartment 2, if Officer Hagarty did not know that Defendant resided at apartment 2. Third, Officer Hagarty had already determined that Ryder had alerted/indicated on apartment 2 prior to Ryder sitting outside apartment 2. On his first pass by the doors on the middle level of the apartment building, Ryder sniffed the bottom left door seam, worked across the door, and snapped his head back toward the left door seam, and then started to sit, but did not fully sit. Ryder then attempted to go up to the upper level of the apartment building, but Officer Hagarty had Ryder do another pass on the middle level of the building. On his second pass, Ryder, before sniffing the bottom seam of right door, snapped his head toward the handle of the right door, and, after sniffing the right door, made a whining noise. According to Officer Hagarty, Ryder whined because he was not rewarded for detecting narcotics at apartment 2. After sniffing the two doors on the upper level of the building, where Ryder did not alert or indicate, Officer Hagarty paused to write a note that Ryder had alerted/indicated on apartment 2. Officer Hagarty and Ryder returned to the middle level. After again sniffing at the door to apartment 2, Ryder sat (indicated) outside apartment 2. Based on the totality of the circumstances, I find that Mr. Potter's opinion regarding cueing does not establish any cueing and does not diminish Ryder's reliability.

At the hearing, Mr. Potter also raised concerns about Officer Hagarty handling methamphetamine, placing it in an evidence bag, and placing the bag in the front seat of his patrol car. Mr. Potter opined that Officer Hagarty's actions transferred the odor of

32

narcotics to Ryder, "destroy[ing] . . . [Ryder's] ability to smell for the next several hours" and "completely invalidate[d] the dog sniff." (Potter Hr'g Test. at 160-61.) However, Mr. Potter admitted that his opinion was based solely on anecdotal evidence, that is his own personal experience and knowledge of dogs. (*Id.* at 189.) Mr. Potter could point to no studies, reports, journals, or other materials to support his opinion. (*Id.*) Mr. Potter also did not address the fact that the methamphetamine was placed inside a sealed evidence bag and what if any effect that would have. Based on the foregoing, this concern does not affect the determination of Ryder's reliability or probable cause.

For these reasons, and my description of the circumstances of the search addressed in the *Franks* discussion above, I conclude that Defendant has not undermined the presumption that Ryder's alert provided sufficient probable cause for the search of apartment 2.

### 3.    *Was there sufficient nexus to support probable cause for the search warrant?*

In addition to the argument that the warrant lacked probable cause because of Ryder's alleged lack of qualifications or the circumstances surrounding the search, Defendant raises a more familiar challenge to probable cause. That is, Defendant claims that probable cause is lacking because of an alleged lack of nexus between Defendant and apartment 2.

#### a.    *Relevant law*

"When determining whether a warrant affidavit is sufficient for probable cause, 'our role is to ensure that the issuing [court] had a substantial basis for concluding that probable cause existed.'" *United States v. Mayo*, 97 F.4th 552, 555 (8th Cir. 2024) (alteration in original) (quoting *United States v. Juneau*, 73 F.4th 607, 614 (8th Cir. 2023)). "Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quoting *Juneau*, 73 F.4th

at 614, in turn quoting *United States v. Gater*, 868 F.3d 657, 660 (8th Cir. 2017)). "The probable-cause inquiry 'is not a high bar, [and] we pay great deference to the issuing [court]'s determination.'" *Id.* (quoting *Juneau*, 73 F.4th at 614) (alterations in original).

### b.    Application

Officer Hagarty testified that Ryder indicated on apartment 2. (Hagarty Hr'g Test. at 45.) Officer Hagarty based his determination that Ryder alerted/indicated on apartment 2 on the following: (1) When he initially sniffed the two apartment doors on the middle level of the apartment building, Ryder sniffed the door to apartment 2 at the bottom left door seam, worked across the door, snapped his head back toward the left door seam, and started to go into a sit, but did not go into a full sit due to the cramped nature of the middle level landing;[12] (2) on his second sniff of the two doors on the middle level of the building, before sniffing the door for apartment 2, Ryder snapped his head toward the handle of the right door, and, after sniffing the right door, made a whining noise because Ryder was not rewarded for detecting narcotics at apartment 2;[13] and (3) on the third time on the middle level of the building, Officer Hagarty directed Ryder to sniff at the seams of apartment 2 again, and, ultimately, Ryder attempted to sit again, whined, and then fully sat down in front of apartment 2.[14] (*Id.* at 38-43.) Based on the foregoing, I find that Ryder alerted/indicated on apartment 2, and, because as discussed in section ***III.B.2.b*** above, I found Ryder to be a reliable drug dog, I conclude that there was substantial evidence to support probable cause for the search warrant issued for apartment 2. *See Mayo*, 97 F.4th at 555.

Mr. Potter's testimony that Ryder did not attempt to go into a sit after sniffing the door to apartment 2 is unpersuasive. Mr. Potter's testimony was in regard to a different

---

[12] Def. Ex. A at 12:15:49-12:16:07, 00:54-1:12.
[13] Def. Ex. A at 12:16:10-12:16:19, 1:15-1:24.
[14] Def. Ex. A at 12:17:13-12:17:40, 2:18-2:45.

34

portion of Officer Hagarty's body camera video than the portion where Ryder attempts to go into a sit.  *Compare* Def. Ex. A at 12:15:49-12:16:07, 00:54-1:12 (Ryder attempts to sit) *with* Def. Ex. A at 12:16:14, 1:19 (the point in the video where Mr. Potter testified Ryder did not attempt to sit).

Defendant argues that the search warrant affidavit did not "establish specific facts from which a magistrate judge could reasonably conclude that the items sought in the search warrant application would be found in Apartment 2" because the search warrant affidavit contained no nexus between Defendant and apartment 2 and was devoid of any showing of suspicious activity associated with apartment 2.  (Doc. 24-1 at 8.)  This argument is misplaced.   Defendant relies on *United States v. Lalor*, 996 F.2d 1578 (4th Cir. 1993), a case that is easily distinguishable.  In *Lalor*, the search warrant affidavit focused primarily on information from two informants regarding defendant selling them drugs in a particular area, Northern Parkway and Loch Raven Boulevard.  996 F.2d at 1579-80.   The affidavit also contained information that the defendant lived in an apartment located on Waverly Way, a street near where the defendant sold the informants drugs.  *Id*. at 1580.  The Fourth Circuit determined that "the affidavit is devoid of any basis from which the magistrate could infer that evidence of drug activity would be found at 1572 Waverly Way" as the affidavit did not "describe circumstances that indicate such evidence was likely to be stored at [the defendant's] residence." *Id*. at 1582.  The facts of *Lalor* are not the facts of this case.  As the Government points out, unlike *Lalor*, the search warrant affidavit in this case focused on apartment 2, not Defendant's drug trafficking activity.  (Doc. 27-1 at 10.)   The Government asserts that, "[w]hile [D]efendant may argue that the affidavit lacked probable cause that he was involved in drug possession or trafficking, that is not the right inquiry for the Court"; and "[i]nstead, this Court should look at whether or not there was probable cause to search the apartment."  (*Id*.)

*United States v. Navarrete-Rivera*, No. 22-cr-0052 (DWF/JFD), 2022 WL 18587736 (D. Minn. Nov. 21, 2022), *R. & R. adopted*, 2023 WL 142806 (D. Minn. Jan. 10, 2023) is helpful in this regard. *Navarrete-Rivera* involved a search warrant based upon, among other things, a dog sniff of an exterior apartment door, where the dog indicated to the presence of narcotics. 2022 WL 18587736 at *3. The defendant argued that the search warrant affidavit "did not establish a nexus between his apartment and criminal activity or contraband." *Id*. at *5. The district court determined that a nexus between the defendant's apartment and criminal activity or contraband existed and explained that:

> The United States contends that the nexus in this case was provided by [the drug dog's] positive indication to the presence of a narcotics odor coming from the exterior door to Apartment #13xx. The Court agrees. "Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present." *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007) (citing *United States v. Sundby*, 186 F.3d 873, 875–76 (8th Cir. 1999)). "To establish the dog's reliability, the affidavit need only state the dog has been trained and certified to detect drugs." *Sundby*, 186 F.3d at 876. Agent Fletcher's affidavit stated that [his dog] is a certified narcotics detector dog—certified and trained specifically to detect narcotics. Under *Sundby*, that statement was enough to establish [the dog's] reliability for the purpose of the search warrant. Moreover, [the dog's] positive indication to the presence of narcotics emanating from Apartment #13xx established probable cause to believe there were drugs inside. *See Donnelly*, 475 F.3d at 955.

*Id*. Here, the facts are generally the same as in *Navarrete-Rivera*. The nexus in this case is provided by Ryder's alert/indication on apartment 2 without regard to Defendant's relationship to drugs or the apartment. Simply put, Ryder's alert established probable cause to believe there was contraband in the apartment that was evidence of a crime.

36

Thus, based on all the foregoing, I recommend that the motion to suppress be denied.

**4.**      ***Was the dog sniff illegal and did Defendant have a reasonable expectation of privacy?***

      ***a.***     ***Waiver***

Federal Rule of Criminal Procedure 12(c)(3) provides that:

> If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause.

*Id.* "The district court has discretion to consider an untimely motion if the party shows good cause for the delay." *United States v. Reichel*, 911 F.3d 910, 916 (8th Cir. 2018). "[G]ood cause . . . requires a showing of cause and prejudice." *Id.* (alteration in original) (quoting *United States v. Paul*, 885 F.3d 1099, 1104 (8th Cir. 2018)); *see also United States v. Fogg*, 922 F.3d 389, 391 (8th Cir. 2019) ("To show good cause, a party must show both cause and prejudice.").

Additionally, Local Rule 7(g)[15] provides that:

> Ordinarily, reply briefs are unnecessary, and the court may elect to rule on a motion without waiting for a reply brief. However, the moving party may, within 7 days after a resistance to a motion is served, file a reply brief, not more than 5 pages in length, to assert newly-decided authority or to respond to new and unanticipated arguments made in the resistance. In the reply brief, the moving party must not reargue points made in the opening brief.

*Id.*

---

[15] Pursuant to Local Criminal Rule 47, Local Rule 7 governs motion procedure in criminal cases, except a resistance to a motion in a criminal case must be filed within 7 days after the motion is served.

37

Here, Defendant's reply brief did not address newly-decided authority or respond to new or unanticipated arguments set forth in the Government's resistance. Instead, the reply brief raised a new issue regarding the legality of the dog sniff and whether Defendant had a reasonable expectation of privacy outside his apartment door. Even though Defendant's reply brief does not comport with LR 7 and raised an issue that is untimely, Defendant asserts that he has good cause for not raising the issue timely and would be prejudiced by the Court failing to address the issue. Specifically, Defendant offers the following reasons for untimely raising the issue regarding the legality of the dog sniff and his expectation of privacy: (1) Defendant received the dog sniff video three days prior to the motion deadline; (2) defense counsel received a proposed plea agreement three days prior to the motion deadline and a revised plea agreement one day prior to the motion deadline; and (3) defense counsel had to travel from Des Moines to Marshall County to meet with Defendant regarding the proposed plea agreements and the dog sniff video. (Doc. 37 at 2-3.) Based on the foregoing, Defendant asserts that defense counsel had limited time to research and brief the motion to suppress. "After filing the opening brief, counsel had more time to fully research the suppression issues in the case and at that time determined there were additional bases for suppression that should be raised." (*Id*. at 3.) Defendant also asserts that he would be prejudiced by the Court declining to consider the issue because it may have a "significant impact on the . . . case against [him] due to the evidence uncovered as a result of the canine sniff of the door." (*Id*. at 4.) (Citing *United States v. Gonzalez*, 81 F.Supp.3d 1212, 1224 (D.N.M. 2015)).

Even though Defendant failed to comply with LR 7(g) by raising a new issue in his reply brief, as opposed to following the Local Rule's limitations on reply briefs to addressing newly decided authority or responding to unanticipated arguments raised in a resistance, Defendant has arguably shown good cause for not raising the issue in his opening brief and has shown that he would be prejudiced if the Court declined to address

38

the new issue. The timing of receipt of the dog sniff video and proposed plea agreement three days before the motion to suppress deadline hampered defense counsel's ability to fully research and argue the motion to suppress. Deadlines are important and Defendant knew the deadline for filing the motion to suppress. However, the dog sniff video is a very important piece of evidence in this case and receiving the video three days before the motion to suppress deadline coupled with defense counsel's duty to confer with Defendant regarding the Government's proposed plea agreement, also received by defense counsel three days prior to the motion to suppress deadline, weighs in favor of finding good cause for the untimely argument raised in the reply brief.

That Defendant would be prejudiced by the Court declining to consider whether the dog sniff was illegal and whether Defendant had an expectation of privacy to the area immediately outside his apartment door is easily evident, as a finding in favor of Defendant would greatly affect the case against him. Finally, the Government's reliance on *United States v. Pickens*, 58 F.4th 982 (8th Cir. 2023) is misplaced and the case is distinguishable from the present case. In *Pickens*, the defendant filed a pretrial motion to suppress. *After the trial*, the defendant raised, for the first time, an additional Fourth Amendment argument which should have and could have been raised in the *pretrial* motion. The defendant also made no attempt to show good cause for the untimeliness of his post-trial motion. *See id*. at 987-88. This is not the case here and I am unpersuaded that *Pickens* supports a finding of waiver of the untimely issue raised in Defendant's reply brief. Accordingly, I recommend that the District Court conclude Defendant has not waived the issue of whether the dog sniff was illegal and whether Defendant had an expectation of privacy immediately outside his apartment door and address the merits of the issue.

###### b.    Relevant law

In *Florida v. Jardines*, 569 U.S. 1 (2013), law enforcement, based on an unverified tip of marijuana cultivation, had a drug dog sniff at the front porch of the defendant's home.  *Id*. at 3-4.  After sniffing the base of the front door, the dog sat, indicating for the presence of narcotics.  *Id*. at 4.  Based on the dog's indication/alert, law enforcement applied for and received a search warrant for the residence.  *Id*.  The search of the residence revealed marijuana plants and the defendant was charged with marijuana trafficking.  *Id*.

The Supreme Court framed the Fourth Amendment issue involving the dog sniff as follows:

> The officers were gathering information in an area belonging to [the defendant] and immediately surrounding his house—in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

*Id*. at 5-6.  The Supreme Court noted that a "front porch is the classic exemplar of an area adjacent to the home" and is a constitutionally protected area.  *Id*. at 7.  The Supreme Court determined that:

> As it is undisputed that the detectives had all four of their feet and all four of their companion's firmly planted on the constitutionally protected extension of [the defendant's] home, the only question is whether [the defendant] had given his leave (even implicitly) for them to do so.  He had not. . . .
>
> We have . . . recognized that "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds."  *Breard v. Alexandria*, 341 U.S. 622, 626, 71 S.Ct. 920, 95 L.Ed. 1233 (1951).  This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to

linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do." *Kentucky v. King*, 563 U.S. [452], [469], 131 S.Ct. 1849, 1862, 179 L.Ed.2d 865 (2011).

But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do that. An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police. The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose. Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics. Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

*Id*. at 8-9. Further, the Supreme Court noted that "we need not decide whether the officers' investigation of [the defendant's] home violated his expectation of privacy" because the fact that "the officers learned what they learned only by physically intruding on [the defendant's] property to gather evidence is enough to establish that a search occurred." *Id*. at 11. Thus, the Supreme Court held that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search withing the meaning of the Fourth Amendment." *Id*. at 11-12.

In her concurrence, Justice Kagan noted that "[t]he Court today treats this case under a property rubric; I write separately to note that I could just as happily have decided it by looking to [the defendant's] privacy interests." *Id*. at 13. Justice Kagan stated that:

It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align. The law of property "naturally enough influence[s]" our "shared social expectations" of what places should be free from governmental incursions. *Georgia v. Randolph*, 547 U.S. 103, 111, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006); *see Rakas v. Illinois*, 439 U.S. 128, 143, n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). And so the sentiment "my home is my own," while originating in property law, now also denotes a common understanding—extending even beyond that law's formal protections—about an especially private sphere. [The defendant's] home was his property; it was also his most intimate and familiar space.

*Id*. at 13-14 (first alteration in original). Justice Kagan noted that "[i]f we had decided this case on privacy grounds, we would have realized that *Kyllo v. United States*, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), already resolved it." *Id*. at 14. Justice Kagan explained that:

The *Kyllo* Court held that police officers conducted a search when they used a thermal-imaging device to detect heat emanating from a private home, even though they committed no trespass. Highlighting our intention to draw both a "firm" and a "bright" line at "the entrance to the house," [533 U.S.], at 40, 121 S.Ct. 2038, we announced the following rule:

"Where, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." *Ibid*.

That "firm" and "bright" rule governs this case: The police officers here conducted a search because they used a "device . . . not in general public use" (a trained drug-detection dog) to "explore details of the home" (the presence of certain substances) that they would not otherwise have discovered without entering the premises.

*Id*. at 14-15.

In *United States v. Whitaker*, 820 F.3d 849 (7th Cir. 2016), relying on Justice Kagan's concurrence in *Jardines*, the Seventh Circuit Court of Appeals held that "[t]he police engage[] in a warrantless search within the meaning of the Fourth Amendment when they ha[ve] a drug-sniffing dog come to the door of [an] apartment and search for the scent of illegal drugs." *Id.* at 854. In *Whitaker*, law enforcement had information through an informant and through investigation that the defendant had illegal drugs in his apartment. Officers took a drug dog:

> to the second floor of the apartment building and into its locked hallway, where there were at least six to eight apartments. According to his police report . . . [the canine handler] took [the dog] on a quick walk through the hallway in order to get used to any people or animal smells. During the first pass, [the dog] showed extreme interest in [the defendant's apartment] but did not alert. [The dog] then alerted to the presence of drugs at the door of nearby [a]partment [ ]. [An investigating officer] told [the canine handler] that it was not the targeted apartment. On a secondary sniff, [the dog] alerted on [the defendant's apartment].

*Id.* at 851. Law enforcement obtained a search warrant based on the dog sniff and recovered cocaine, heroin, and marijuana from the defendant's apartment. *Id.* The defendant filed a motion to suppress which the district court denied.

On appeal, the defendant argued that "the district court erred in holding that he had no expectation of privacy in the apartment building's common hallway and denying his motion to suppress the evidence gathered from his apartment." *Id.* at 852. The defendant asserted that "*Jardines* should be extended to the hallway outside his apartment door because the law enforcement took the dog to his door for the purpose of gathering incriminating forensic evidence." *Id.* The Seventh Circuit noted that "[a]lthough [the defendant] recognizes that *Jardines* was premised on trespass to property, he also argues that this use of a drug-detection dog violated his privacy interests under *Kyllo v. United States*, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), and *Katz v. United States*,

389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)." *Id*. The Seventh Circuit explained that:

> The use of a drug-sniffing dog here clearly invaded reasonable privacy expectations, as explained in Justice Kagan's concurring opinion in *Jardines*. The police in *Jardines* could reasonably and lawfully walk up to the front door of the house in that case to knock on the door and ask to speak to the residents. The police were not entitled, however, to bring a "super-sensitive instrument" to detect objects and activities that they could not perceive without its help. 133 S.Ct. at 1418. The police could not stand on the front porch and look inside with binoculars or put a stethoscope to the door to listen. Similarly, they could not bring the super-sensitive dog to detect objects or activities inside the home. As Justice Kagan explained, viewed through a privacy lens, *Jardines* was controlled by *Kyllo*, which held that police officers conducted a search by using a thermal-imaging device to detect heat emanating from within the home, even without trespassing on the property. 133 S.Ct. at 1419.

> *Kyllo* held that where "the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." 533 U.S. at 40, 121 S.Ct. 2038. That rule reflects a concern with leaving "the homeowner at the mercy of . . . technology that could discern all human activity in the home." *Id*. at 35–36, 121 S.Ct. 2038. A dog search conducted from an apartment hallway comes within this rule's ambit. A trained drug-sniffing dog is a sophisticated sensing device not available to the general public. The dog here detected something (the presence of drugs) that otherwise would have been unknowable without entering the apartment.

> Indeed, the fact that this was a search of a home distinguishes this case from dog sniffs in public places in *United States v. Place*, 462 U.S. 696, 698, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (luggage at airport), and *Illinois v. Caballes*, 543 U.S. 405, 406, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) (traffic stop). Neither case implicated the Fourth Amendment's core concern of protecting the privacy of the home. It is true that [the defendant] did not have a reasonable expectation of complete privacy in his apartment hallway. *See United States v. Concepcion*, 942 F.2d 1170, 1172 (7th Cir.1991). [The defendant's] lack of a reasonable expectation of complete

privacy in the hallway does not also mean that he had no reasonable expectation of privacy against persons in the hallway snooping into his apartment using sensitive devices not available to the general public.

[The defendant's] lack of a right to exclude did not mean he had no right to expect certain norms of behavior in his apartment hallway. Yes, other residents and their guests (and even their dogs) can pass through the hallway. They are not entitled, though, to set up chairs and have a party in the hallway right outside the door. Similarly, the fact that a police officer might lawfully walk by and hear loud voices from inside an apartment does not mean he could put a stethoscope to the door to listen to all that is happening inside. Applied to this case, this means that because other residents might bring their dogs through the hallway does not mean the police can park a sophisticated drug-sniffing dog outside an apartment door, at least without a warrant. *See Jardines*, 133 S.Ct. at 1416.

The practical effects of *Jardines* also weigh in favor of applying its holding to dog sniffs at doors in closed apartment hallways. Distinguishing *Jardines* based on the differences between the front porch of a stand-alone house and the closed hallways of an apartment building draws arbitrary lines.

*Id*. at 852-54. The Seventh Circuit concluded that "[t]he police engaged in a warrantless search within the meaning of the Fourth Amendment when they had a drug-sniffing dog come to the door of the apartment and search for the scent of illegal drugs." *Id*. at 854.

In *United States v. Scott*, 610 F.3d 1009 (8th Cir. 2010), a case involving a search warrant based on a dog sniff of an apartment door in a common hallway, the Eighth Circuit Court of Appeals held that a dog sniff of an "apartment door frame from a common hallway d[oes] not constitute a search subject to the Fourth Amendment." *Id*. at 1016. The Eighth Circuit further stated:

We reject [the defendant's] argument that this court should extend the holding in *Kyllo v. United States*, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), to encompass dog sniffs. Indeed, the Supreme Court rejected such an interpretation of *Kyllo* in *Caballes*. *See* 543 U.S. at 409–410, 125 S.Ct. 834. In *Kyllo*, the Supreme Court held that "obtaining by sense-enhancing technology any information regarding the interior of the

45

home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area, constitutes a search—at least where (as here) the technology in question is not in general public use." *Kyllo*, 533 U.S. at 34, 121 S.Ct. 2038 (citation and internal quotation marks and citations omitted). Unlike the thermal imaging technology at issue in *Kyllo*, narcotics dog sniffs are not "capable of detecting lawful activity." *Caballes*, 543 U.S. at 409, 125 S.Ct. 834. Thus, the Supreme Court has treated narcotics dog sniffs as "*sui generis*." *Place*, 462 U.S. at 707, 103 S.Ct. 2637. We see no reason to do otherwise.

*Id*.

More recently, the Eighth Circuit addressed *Scott*, which was decided before *Jardines* and *Whitaker*, in *United States v. Perez*, 46 F.4th 691 (8th Cir. 2022). In *Perez*, law enforcement took a drug sniffing dog to an apartment complex where the defendant resided and where an informant had told officers that the defendant had a pistol and was selling drugs. *Id*. at 696. During the dog sniff, the dog "did not alert at any of the second-floor apartments. On the third floor, [the dog] alerted to two apartments, numbers 10[16] and 12, about three to six inches from the bottom seams of the doors. Each apartment door is recessed from the main hallway in an alcove. Photos taken later show shoes and a doormat in the alcove area outside Apartment 10." *Id*. Based on the dog sniff, law enforcement obtained a search warrant for the defendant's apartment and upon executing the search warrant found drugs and a pistol. *Id*. On appeal, the defendant argued that "the district court erred in denying his motion to suppress because the dog sniff violated his Fourth Amendment rights, either as a physical intrusion on the curtilage of his home pursuant to . . . *Jardines*, . . . or as a violation of his reasonable expectation of privacy in the area immediately outside his apartment door." *Id*. at 697. Relying on the good faith exception, the Eighth Circuit affirmed the district court's denial of the defendant's motion to suppress. The Eighth Circuit explained:

---

[16] The defendant in *Perez* resided in Apartment 10.

46

Before the Supreme Court decided in *Jardines* that a drug dog sniff on the front porch of a house is an unlawful intrusion on the curtilage of a home, *see* 569 U.S. at 6–7, 133 S.Ct. 1409, this court rejected a Fourth Amendment challenge to a drug dog sniff outside an interior apartment door in *United States v. Scott*, 610 F.3d 1009, 1016 (8th Cir. 2010). At the time Officer Farley requested, and Officer Kopeke performed, the dog sniff outside Apartment 10, we had neither expressly overruled *Scott* nor explained how *Jardines* applies to apartment doors in a common hallway. *See United States v. Hopkins*, 824 F.3d 726, 732 & n.3 (8th Cir. 2016) ("In this case we need not consider how *Jardines* applies to interior hallways of an apartment complex."). Based on the state of our caselaw at the time of the search, we find that the good faith exception applies. It was reasonable for the officers to rely on our then-applicable precedent that dog sniffs at an interior apartment door are permissible. *See Davis v. United States*, 564 U.S. 229, 241, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011) ("Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.").

*Id*. at 697-98; *see also United States v. Hines*, 62 F.4th 1087, 1092-93 (8th Cir. 2023) (stating *Perez* controls and applying good faith exception to dog sniff of an apartment door where at the time of the dog sniff the Eighth Circuit "had neither expressly overruled *Scott* nor explained how *Jardines* applies to apartment doors in a common hallway") (quotation omitted).

In *United States v. Navarrete-Rivera*, No. 22-cr-0052 (DWF/JFD), 2022 WL 18587736 (D. Minn. Nov. 21, 2022), *R. & R. adopted*, 2023 WL 142806 (D. Minn. Jan. 10, 2023), the district court addressed *Jardines*, *Whitaker*, and *Perez* in the context of a dog sniff of the exterior apartment door:

[The defendant] relies primarily on *United States v. Whitaker*, 820 F.3d 849, 852 (7th Cir. 2016), a Seventh Circuit opinion that used the logic of the *Jardines* concurring opinion to hold that dog sniffs of the exterior doors of apartments that open onto a common hallway "invaded reasonable privacy expectations" and are therefore "searches" within the meaning of the Fourth Amendment, meaning such dog sniffs cannot be conducted by law enforcement without either a search warrant or an applicable exception

47

to the warrant requirement. *Id*. Justice Kagan would have decided *Jardines* on privacy interests, as well as property interests, *id*. at 13, and that is exactly what the Seventh Circuit did in *Whitaker*.

But the Eighth Circuit has not extended Justice Kagan's and the Seventh Circuit's privacy-interests rationale to dog sniffs of exterior apartment doors. When presented, in *United States v. Perez*, 46 F.4th 691 (8th Cir. 2022), with the opportunity of deciding the constitutionality of bringing a detection dog into a hallway of a multi-unit apartment complex and having the dog sniff the exterior doors of apartments, the Eighth Circuit did not decide the Fourth Amendment issue, but proceeded straight to a discussion of the good-faith exception to the exclusionary rule announced in *Leon v. United States*, 468 U.S. 897 (1984). The Eighth Circuit did not analyze the dog sniff either as a physical intrusion under *Jardines* or as a violation of a reasonable expectation of privacy under *Katz*. The *Perez* court remarked that, at the time that the dog sniff was conducted, "we had neither expressly overruled *Scott* nor explained how *Jardines* applies to apartment doors in a common hallway." *Perez*, 46 F.4th at 697–98. Notwithstanding this language, the *Perez* court did not proceed to expressly overrule *Scott*, nor to explain the applicability of *Jardines* to sniffing doors in a common hallway. Instead, the court continued, "Based on the state of our caselaw at the time of the search, we find that the good faith exception applies. It was reasonable for the officers to rely on our then-applicable precedent that dog sniffs at an interior apartment door are permissible." *Id*. at 698.

Consequently, at the time of the dog sniff in this case, *Scott* was still the law in the Eighth Circuit. When [the dog] sniffed the exterior door of [the defendant's] apartment, the Eighth Circuit had "neither expressly overruled *Scott* nor explained how *Jardines* applies to apartment doors in a common hallway." *Scott* is still the law in this Circuit, and under *Scott*, a dog sniff of an exterior apartment door opening into a common hallway is constitutional. *Jardines* did not overrule *Scott*, nor could it, because *Jardines'* holding is premised on a property-rights analysis, and apartment tenants do not have a property interest in the common hallway outside their door. [The defendant's] argument appears to be that *Perez*, by proceeding directly to good faith (an exception to the exclusionary rule that only comes into play after a search has been found unconstitutional), has *sotto voce* overruled *Scott*, or at least invited lower courts in this Circuit to hold that dog sniffs of apartment doors are unconstitutional. (*Perez* also described

*Scott* as "our then-applicable" precedent, a phrase that might imply that *Scott* was precedent then but is not precedent now.) This Court does not agree that *Perez* overruled *Scott*, although there is certainly language in *Perez* suggesting that the Eighth Circuit, or at least the *Perez* panel, might overrule *Scott* in a later case. But lower federal courts are not to anticipate what a higher court may do. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

*Id*. at *6; *see also United States v. Cage*, No. 23-cr-334 (MJD/TNL), 2024 WL 1136793, at *18 (D. Minn. Mar. 15, 2024) ("Because *Scott* remains the law of the Eighth Circuit and *Jardines* did not speak to the constitutionality of a canine sniff in a common hallway outside an apartment, the [c]ourt concludes that the canine sniffs occurring in the common hallways of the Portland Avenue and Bren Road residences did not constitute a warrantless search in violation of the Fourth Amendment") (quotation omitted); *United States v. White*, No. 22-cr-207 (JRT/ECW), 2023 WL 5753678, at *13 (D. Minn. June 5, 2023) ("Given that *Scott* remains the law of the Eighth Circuit and *Jardines* did not speak to the constitutionality of a canine sniff in a common hallway outside an apartment, the [c]ourt does not find that the canine sniff violated the Fourth Amendment.").

In *Davis v. United States*, 564 U.S. 229 (2011), the Supreme Court addressed the issue of whether to apply the exclusionary rule "when the police conduct a search in compliance with binding precedent that is later overruled." *Id*. at 232. The Supreme Court held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Id*. The Supreme Court noted that in "a line of cases beginning with [*United States v.*] *Leon*, 468 U.S. 897 [(1984)], we . . . recalibrated our cost-benefit analysis in exclusion cases to focus the

inquiry on the "flagrancy of the police misconduct" at issue." *Davis*, 564 U.S. at 238.

The Supreme Court explained that:

> Under our exclusionary-rule precedents, this acknowledged absence of
> police culpability dooms Davis' claim. Police practices trigger the harsh
> sanction of exclusion only when they are deliberate enough to yield
> "meaningfu[l]" deterrence, and culpable enough to be "worth the price paid
> by the justice system." *Herring* [*v. United States*], 555 U.S. [135, 144],
> 129 S.Ct. 695 [(2009)]. The conduct of the officers here was neither of
> these things. The officers who conducted the search did not violate Davis'
> Fourth Amendment rights deliberately, recklessly, or with gross
> negligence. *See ibid*. Nor does this case involve any "recurring or systemic
> negligence" on the part of law enforcement. *Ibid*. The police acted in strict
> compliance with binding precedent, and their behavior was not wrongful.
> Unless the exclusionary rule is to become a strict-liability regime, it can
> have no application in this case.
>
> Indeed, in 27 years of practice under *Leon's* good-faith exception, we have
> "never applied" the exclusionary rule to suppress evidence obtained as a
> result of nonculpable, innocent police conduct. *Herring*, *supra*, at 144, 129
> S.Ct. 695. . . .
>
> Responsible law enforcement officers will take care to learn "what is
> required of them" under Fourth Amendment precedent and will conform
> their conduct to these rules. *Hudson* [*v. Michigan*], 547 U.S. [586,] 599,
> 126 S.Ct. 2159 [(2006)]. But by the same token, when binding appellate
> precedent specifically authorizes a particular police practice, well-trained
> officers will and should use that tool to fulfill their crime-detection and
> public-safety responsibilities. An officer who conducts a search in reliance
> on binding appellate precedent does no more than "'ac[t] as a reasonable
> officer would and should act'" under the circumstances. Leon, 468 U.S.,
> at 920, 104 S.Ct. 3405 (quoting *Stone* [*v. Powell*], 428 U.S. [465,] 539–
> 540, 96 S.Ct. 3037 [(1976)] (White, J., dissenting)). . . .
>
> We have stated before, and we reaffirm today, that the harsh sanction of
> exclusion "should not be applied to deter objectively reasonable law
> enforcement activity." [*Leon*, 468 U.S.] at 919, 104 S.Ct. 3405. Evidence

50

obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.

*Id*. at 240-41 (first and fifth alteration in original).

### c. Application

At the outset, I note that Defendant, without citation to any authority or analysis, mentions on multiple occasions that the apartment building was locked when Officer Hagarty first attempted to enter the building with Ryder. It is unclear whether Defendant is implying that the fact that the door to the apartment building was locked goes to the legality of the search. Therefore, I will address the issue.

In *United States v. Eisler*, a DEA Agent entered an apartment complex "by going in right behind a tenant who had opened a door and watched the defendant and overheard the defendant talking inside an apartment from a common hallway." 567 F.2d 814, 816 (8th Cir. 1977). The Eighth Circuit held that the defendant did not have a "reasonable expectation of privacy in the hallway of the apartment building." *Id*. The Eighth Circuit explained that "[t]he locks on the doors to the entrances of the apartment complex were to provide security to the occupants, not privacy in common hallways." *Id*. In *United States v. McGrane*, a DEA Agent entered the basement of a two-story building with four apartments through an unlocked door and observed chemicals used for making illegal drugs in a storage bin belonging to the apartment number where the defendant resided. 746 F.2d 632, 633 (8th Cir. 1984). Following *Eisler*, the Eighth Circuit determined that the basement of the apartment building "constituted a common area of the building, accessible to all tenants and the landlord" and the defendant "did not have an expectation of privacy extending into the basement and the visual inspection of a storage locker in this area did not violate the fourth amendment." *Id*. at 634. More recently in *Azam v. City of Columbia Heights*, the City of Columbia Heights directed its police force to investigate and sanction Azam, the owner and landlord of problem rental properties, for

51

violations of the City's municipal code. 865 F.3d 980, 891 (8th Cir. 2017) (per curiam). Law enforcement entered "Azam's rental buildings, without consent or a warrant, to look for municipal-code violations and cit[ed] Azam for all violations discovered."[17] *Id*. at 981-82. Azam sued the City under Section 1983 for violations of his Fourth Amendment rights. *Id*. at 982. Following *Eisler* and *McGrane*, the Eighth Circuit held that like the resident of an apartment in a multi-apartment building, owners and landlords also do not "have a reasonable expectation of privacy in the common areas of [their] rental buildings." *Id*. at 990; *see also United States v. Correa*, 653 F.3d 187, 191 (3d Cir. 2011) (holding that a "resident lacks an objectively reasonable expectation of privacy in the common areas of a multi-unit apartment building with a locked exterior door") (citations omitted); *United States v. Deans*, 549 F.Supp.2d 1085, 1094 (D. Minn. 2008) (finding that officers who used keys to enter an apartment building garage, apartment building lobby, and apartment building hallways that were locked and not accessible to the public did not violate the constitution because "tenants of an apartment building do not have a reasonable expectation of privacy in the hallway of that building even though the building was protected by a security system"); *United States v. Shabazz*, 883 F.Supp. 422, 427 (D. Minn. 1995) ("No Fourth Amendment violation occurred when the agents deliberately circumvented the building's security door, as defendant had no reasonable expectation of privacy in the common hallway.").

Here, when Officer Hagarty arrived at the apartment building, he found that the entrance was locked. Officer Hagarty met an individual leaving the apartment building who gave Officer Hagarty the code to enter the building. (Hagarty Hr'g Test. at 27-28, 74.) Officer Hagarty testified that he believed the individual exiting the building and who gave him the code resided at the building. (*Id*. at 77.) Based on *Eisler*, *McGrane*, and

---

[17] The Eighth Circuit noted that law enforcement entered Azam's buildings "even if they were locked." *Azam*, 865 F.3d at 982.

*Azam*, I find that Officer Hagarty entering the locked apartment building by using a code from and individual exiting the building was not a Fourth Amendment violation.

Next, I will address the legality of the dog sniff itself. Under *Scott*, a cased decided before both *Jardines* and *Whitaker*, the Eighth Circuit held that a dog sniff of an "apartment door frame from a common hallway d[oes] not constitute a search subject to the Fourth Amendment." 610 F.3d at 1016. In *Perez*, the Eighth Circuit stated "we ha[ve] neither expressly overruled *Scott* nor explained how *Jardines* applies to apartment doors in a common hallway." 46 F.4th at 697-98. Similarly, in *Hines*, the Eighth Circuit followed *Perez*, quoting *Perez* and noting that the Eighth Circuit "had neither expressly overruled *Scott* nor explained how *Jardines* applies to apartment doors in a common hallway." 62 F.4th at 1092-93. Thus, agreeing with the trio of recent cases from the United States District Court for the District of Minnesota, I find that "[b]ecause *Scott* remains the law of the Eighth Circuit and *Jardines* did not speak to the constitutionality of a canine sniff in a common hallway outside an apartment," Ryder's sniffs in the common hallways of the apartment building at the center of this case were not illegal and "did not constitute a warrantless search in violation of the Fourth Amendment." *Cage*, 2024 WL 1136793, at *18 (quotation omitted); *see also White*, 2023 WL 5753678, at *13 ("Given that *Scott* remains the law of the Eighth Circuit and *Jardines* did not speak to the constitutionality of a canine sniff in a common hallway outside an apartment, the [c]ourt does not find that the canine sniff violated the Fourth Amendment"); *Navarrete-Rivera*, 2022 WL 18587736, at *6 ("*Scott* is still the law in this Circuit, and under *Scott*, a dog sniff of an exterior apartment door opening into a common hallway is constitutional. *Jardines* did not overrule *Scott*, nor could it, because *Jardines'* holding is premised on a property-rights analysis, and apartment tenants do not have a property interest in the common hallway outside their door."). Accordingly, I recommend that the motion to suppress be denied.

Alternatively, under *Davis v. United States*, 564 U.S. 229 (2011), Defendant's motion to suppress should be denied. Neither *Perez* nor *Hines* overruled *Scott*. Furthermore, in both *Perez* and *Hines*, the Eighth Circuit has implicitly stated that *Jardines* did not overrule *Scott*. *See Perez*, 46 F.4th at 697-98 ("[W]e ha[ve] neither expressly overruled *Scott* nor explained how *Jardines* applies to apartment doors in a common hallway."). Moreover, *Whitaker* is a Seventh Circuit case and its holding that "[t]he police engage[] in a warrantless search within the meaning of the Fourth Amendment when they ha[ve] a drug-sniffing dog come to the door of [an] apartment and search for the scent of illegal drugs" has not been adopted by the Eighth Circuit or any other United States Circuit Court of Appeals. 820 F.3d at 854.

It is indisputable in this case that, when Officer Hagarty brought Ryder into the apartment building for a free-air sniff, he did not violate Defendant's Fourth Amendment rights deliberately, recklessly, or with gross negligence. *See Davis*, 564 U.S. at 240. Because at the time of the dog sniff *Scott* remained good law, "an officer who conducts a search in reliance on binding appellate precedent does no more than ac[t] as a reasonable officer would and should act under the circumstances." *Id.* at 241 (alteration in original) (quotation omitted). Accordingly, Officer Hagarty could rely on *Scott's* holding that "[a dog's] sniff of the apartment door frame from a common hallway d[oes] not constitute a search subject to the Fourth Amendment." 610 F.3d at 1016. Therefore, following *Davis*, I find that even if the district court were to determine that Ryder's free-air sniff in the apartment building constituted a trespass and an unreasonable and illegal search, the exclusionary rule should not be applied as *Scott* remained good law and Officer Hagarty acted in compliance with *Scott*. *See Davis*, 564 U.S. at 241 ("Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.").

54

To the extent that Defendant argues that the dog sniff was illegal and in violation of the Fourth Amendment because the door to his apartment is curtilage, *see Jardines*, I find Defendant's argument unpersuasive. Two district court cases in the Eighth Circuit succinctly explain why Defendant's argument is unpersuasive. In *United States v. Penaloza-Romero*, Criminal No. 13-36 (RHK/TNL), 2013 WL 5472283 (D. Minn. Sept. 30, 2013), law enforcement performed a dog sniff of door seams in a common hallway of an apartment building resulting in a search warrant for the defendant's apartment. *Id.* at *3. In finding that the door to an apartment in a common hallway is not curtilage under *Jardines*, the district court explained:

> Defendant's reliance on *Jardines* is misplaced because it cannot be said the common hallway of the apartment building was curtilage. Defendant relies on *United States v. Dunn*, 480 U.S. 294 (1987), to argue that the hallway is part of the curtilage of Defendant's home. The Court "identified the central component of this inquiry as whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *Id.* at 300 (internal quotations removed). This being the central component, it is difficult to equate this notion with the common hallway of an apartment building. A common hallway is used by residents to travel from their apartment to the outside door and back. This is not the area in which "intimate activities" are likely to occur.
>
> The Court in *Dunn* identified four factors relevant to determining curtilage:
>
>> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.
>
> *Id.* at 301. Applying these factors from *Dunn* does not support finding a common hallway to be curtilage. The common hallway is close to the apartment in question and also within the enclosure surrounding it, meeting the first two factors. The third factor, however, weighs against a finding of curtilage. The nature of a common hallway is not used for intimate

activities, but rather to permit residents of the building ingress and egress to the street. The fourth factor also weighs against a finding that a common hallway is curtilage. Although passers-by may not be able to see the hallway, those with whom he shares the hallway can still view the activities of the resident while in the hallway. Indeed, an apartment resident would most likely not be permitted to shield his activities in the hallway from the other residents, as they have the same right to access it that he does.

Furthermore, it is "well-settled" in the Eighth Circuit "that there exists no 'generalized expectation of privacy in the common areas of an apartment building.'" *United States v. Brooks*, 645 F.3d 971, 976 (8th Cir.2011) (quoting *United States v. McCaster*, 193 F.3d 930, 933 (8th Cir.1999)). The *Brooks* court found that a common staircase at a multi-family dwelling "can[not] be characterized as curtilage." *Id.* at 975. Here, the dog sniff occurred in a common hallway of an apartment building. Without an expectation of privacy in the hallway, it cannot have the same constitutional protections as the curtilage around a house. Accordingly, because the search at issue did not occur on a constitutionally protected extension of the home, *Jardines* is inapposite.

*Id.* at *7-*8.

A more recent case, also involving a dog sniff in a common hallway of an apartment, *United States v. Peck*, No. 8:20CR227, 2022 WL 1224963 (D. Neb. Apr. 26, 2022), explained that:

The Eighth Circuit has applied the trespassory test from *Jardines* in cases where officers have conducted a canine sniff around the exterior of townhomes. Under the circumstances of those cases, the Eighth Circuit found the officers engaged in unlawful searches under the Fourth Amendment. *See United States v. Burston*, 806 F.3d 1123, 1127-28 (8th Cir. 2015) (finding a canine sniff of an exterior window to a townhome was a search under the Fourth Amendment); *United States v. Hopkins*, 824 F.3d 726, 732 (8th Cir. 2016) (finding "[t]he area immediately in front of Hopkins' [exterior] door was also curtilage," and the canine sniff of that area was a search under the Fourth Amendment). The Eighth Circuit expressly did "not consider how *Jardines* applies to interior hallways of an apartment complex." *Hopkins*, 824 F.3d at 732 n.3.

In both *Burston* and *Hopkins*, the Eighth Circuit analyzed whether the area in which the canine sniff occurred was curtilage by applying a multi-factor test from United States v. Dunn, 480 U.S. 294, 301 (1987). *See Burston*, 806 F.3d at 1127; *Hopkins*, 824 F.3d at 731-32. Those factors are "[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." *Hopkins*, 824 F.3d at 731-32. Courts also consider what "daily experience" tells us about the area claimed to be curtilage. *Jardines*, 569 U.S. at 7. The *Dunn* "factors are not mechanically applied and are considered together." *Hopkins*, 824 F.3d at 732.

Applying the *Dunn* factors under the facts of this case, the [c]ourt concludes Peck's door, as accessed from the common hallway of his apartment building, was not curtilage. First, the area sniffed by the canine was immediately next to Peck's home; the canine alerted to the presence of drugs at the outside threshold or jambs of the door into Peck's apartment. The first factor weighs heavily in favor of finding that area to be curtilage, but the remaining factors are not so favorable. The area was not surrounded by an enclosure, and there is no evidence that Peck used the surrounding area for anything other than a means of entering his apartment. *Cf. Hopkins*, 824 F.3d at 732 (finding the third factor weighed in favor of finding the cement area outside the townhome was curtilage because evidence showed that area was "used for grilling and storing bicycles"). Nothing about the hallway or exterior of Peck's door suggests it was an area "to which the activity of home life extends." *Jardines*, 569 U.S. at 7. As to the fourth factor, there is evidence that the exterior of the apartment building was locked to ordinary passersby, but the hallway—which held at least eight other apartments—was completely open to and used freely by other tenants, neighbors, visitors, and apartment management. *Cf. Burston*, 806 F.3d at 1127 (explaining "a bush planted in the area in front of the window" was "likely to prevent close inspection of Burston's window by passersby"). Applying *Dunn*, the [c]ourt cannot conclude the area around Peck's door was curtilage. Accordingly, the sniff was not a search under the trespassory test and *Jardines* line of cases.

*Id.* at *2.

57

Following the reasoning in *Penaloza-Romero* and *Peck*, and applying the *Dunn* factors, I find that the area around Defendant's door is not curtilage under Eighth Circuit law and *Jardines*. While the first *Dunn* factor weighs in favor of a finding of curtilage, the remaining factors do not. The area around Defendant's door was not surrounded by an enclosure (contrary to Defendant's argument that the building itself constitutes an enclosure, I do not believe that the building itself is the type of enclosure contemplated by the concept of curtilage). The body camera video supports that the apartment door was not used for anything other than entering and exiting the apartment. Finally, while the exterior to the building was locked to passersby, the hallway and landings were open and used by other tenants, visitors, and apartment management. Accordingly, I find that the dog sniff was not illegal under the *Jardines* line of cases.

### 5. Is the good faith exception applicable?

#### a. Relevant law

Under the good faith exception articulated in *United States v. Leon*, even if a reviewing court determines substantial evidence to issue a warrant is absent, the court should not suppress evidence seized pursuant to the search warrant if the officers executing the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate or judge. 468 U.S. 897, 922 (1984); *United States v. Houston*, 665 F.3d 991, 994-95 (8th Cir. 2012). "In making this determination, we ask 'whether a reasonably well-trained officer would have known that the search was illegal despite a judge's issuance of the warrant.'" *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (quoting *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015)).

Under the "good-faith exception," if a law enforcement officer's reliance on a warrant was objectively reasonable, the evidence seized pursuant to an invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007).

*Proell* noted that *Leon* identified four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Id*. at 431 (citing *Leon*, 468 U.S. at 923; *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)).

*Leon* explained that "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a judge normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id*. at 922-23 (footnote omitted). "For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, [law enforcement's] prewarrant conduct must have been 'close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable.'" *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)). If the prewarrant conduct is clearly illegal, however, the exception does not apply. *Cannon*, 127 F.3d at 413.

### b. Application

None of the four scenarios imagined by *Leon* apply here. Defendant instead appears to argue that the dog sniff was illegal, and the search warrant affidavit lacked probable cause because there was no nexus between Defendant, the apartment, and illegal

59

activity. (Doc. 24-1 at 9-11, Doc. 30 at 6-7.) As discussed above, I find that the dog sniff was legal and provided probable cause to obtain the search warrant for Defendant's apartment. Nothing on this record shows that any of Officer Hagarty's conduct related to the dog sniff or search warrant affidavit was "clearly illegal." Instead, the record shows that the dog sniff and search warrant affidavit never strayed from, or far from, the line of validity. *See Cannon*, 127 F.3d at 413. Thus, I find that Officer Hagarty's conduct, the dog sniff, and the search warrant affidavit were close enough to the line of validity to justify law enforcement's belief that the search warrant was objectively reasonable. *See id.*

## IV.    CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress. **(Doc. 24.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 8th day of July, 2024.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa